

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-7-1994

# Alvord-Polk, Inc., et al. v. F. Schumacher & Co.

Precedential or Non-Precedential:

Docket 92-1762

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Alvord-Polk, Inc., et al. v. F. Schumacher & Co." (1994). *1994 Decisions*. Paper 153.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/153

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 92-1762

_____

ALVORD-POLK, INC.; AMERICAN BLIND FACTORY,
INC.; DELTA PAINT AND WALLPAPER SUPPLY CO.,
INC.; FAIRMAN WALLPAPER AND PAINT COMPANY;
FRANK R. YOCUM, t/a FRANK R. YOCUM & SONS
WALLPAPER CO.; HARRY'S WALLPAPER, INC.;
LANCASTER CARPET MARKET, INC.; MARVIN KOLSKY,
t/a HEADQUARTERS WINDOWS & WALLS;  SILVER
WALLPAPER & PAINT CO., INC.;  YANKEE
WALLCOVERINGS, INC.,

Appellants,

vs.

F. SCHUMACHER & CO.; THE NATIONAL DECORATING
PRODUCTS ASSOCIATION, INC.

Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 90-03617)

_____

ARGUED MARCH 17, 1993

OPINION VACATED SEPTEMBER 15, 1993

SUBMITTED PURSUANT TO LAR 34.1(a)
ON PANEL REHEARING OCTOBER 25, 1993[*]

BEFORE:  STAPLETON, ROTH and LEWIS, Circuit Judges.

_____

[*]    The motion for oral argument on panel rehearing filed by F.
Schumacher & Co. is denied.

(Filed October 12, 1994)

_____

Steven A. Asher (ARGUED)
Kohn, Nast & Graf
1101 Market Street
24th Floor
Philadelphia, PA  19107

        Attorney for Appellants, Alvord-Polk, Inc.,
        American Blind Factory, Inc.; Delta Paint and
        Wallpaper Supply Co., Inc; Frank R. Yocum,
        t/a Frank R. Yocum & Sons Wallpaper Co.;
        Harry's Wallpaper, Inc.; Lancaster Carpet
        Market, Inc.; Marvin Kolsky, t/a Headquarters
        Windows & Walls; Silver Wallpaper & Paint
        Co., Inc.; Yankee Wallcoverings, Inc.


Michael S. Lando (ARGUED)
1411 Fifth Avenue
Pittsburgh, PA  15219

        Attorney for Appellant, Fairman Wallpaper and
        Paint Company


Margaret M. Zwisler (ARGUED)
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2402

        Attorney for Appellee, F. Schumacher & Co.


Richard D. Lageson (ARGUED)
Gino F. Battisti
Suelthaus & Kaplan, P.C.
7733 Forsyth Boulevard, 12th Floor
St. Louis, MO  63105

        Attorneys for Appellee, The National Decorating
        Products Association, Inc.

_____

OPINION OF THE COURT

LEWIS, Circuit Judge.

For over a decade, retailers who market wallpaper by providing sample books and showroom displays have feuded with dealers who sell at a discount through toll-free "1-800" telephone numbers. In this case, ten 800-number dealers have accused the retailers' trade association and one of the leading wallpaper manufacturers of violating antitrust laws in an attempt to force them out of business. The district court granted summary judgment to the defendants on these and certain state-law claims. We will reverse the grant of summary judgment as to some federal and state antitrust claims but will affirm as to others and as to the 800-number dealers' tort claims.

I.

Our review of a grant of summary judgment is plenary; we evaluate the evidence using the same standard the district court was to have applied in reaching its decision. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1530 (3d Cir. 1990); Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988). Plaintiffs have alleged three theories of antitrust liability under the Sherman Act, 15 U.S.C. § 1 (the "Act"). A brief review of the Act and its purposes informs our determination of the standard to be applied on summary judgment.

A.

> Section 1 of the Sherman Act provides:
> Every contract, combination in the form of
> trust or otherwise, or conspiracy, in
> restraint of trade or commerce among the
> several States, or with foreign nations, is
> declared to be illegal[.]

15 U.S.C. § 1. The very essence of a section 1 claim, of course, is the existence of an agreement. Indeed, section 1 liability is predicated upon some form of concerted action.[1] Fisher v. Berkeley, 475 U.S. 260, 266 (1986); Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767-69 (1984); United States v. Colgate & Co., 250 U.S. 300 (1919); Big Apple BMW, 974 F.2d at 1364. See also Weiss v. York Hospital, 745 F.2d 786, 812 (3d Cir. 1984) (section 1 claim requires proof of three elements, the first of which is "a contract, combination or conspiracy"); Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980) ("[u]nilateral action, no matter what its motivation, cannot violate [section] 1"). A "`unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement[,]'" must exist to trigger section 1 liability. Copperweld, 467 U.S. at 771, quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946). See also Fisher, 475 U.S. at 267; Sweeney, 637 F.2d at 111.

---

[1] The term "concerted action" is often used as shorthand for any form of activity meeting the section 1 "contract, combination or conspiracy" requirement. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445-46 (3d Cir. 1977).

The requirement is an important one, for it emphasizes the distinction between section 1 liability, which is imposed for concerted action in restraint of trade, and liability imposed under section 2 of the Sherman Act for monopolization. See Copperweld, 467 U.S. at 767. Activity which is alleged to have been in violation of section 1 may be subject to a per se standard and engender liability without inquiry into the harm it has actually caused. See Copperweld, 467 U.S. at 768. See generally Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988). Alternatively, section 1 liability might be imposed for concerted action which violates the "rule of reason" standard without proof that it threatened monopolization. Copperweld, 467 U.S. at 768.

Congress treated concerted action more strictly than unilateral behavior because,

> Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

Id. at 768-69. For this reason, when we examine an alleged violation of section 1 of the Sherman Act, we look for an

agreement that "brings together economic power that was previously pursuing divergent goals." Id. at 769. A lack of such divergent goals precludes officers of a single company from conspiring. Neither internally coordinated conduct of a corporation and its unincorporated division, nor activity undertaken jointly by a parent corporation and its wholly owned subsidiary, can form the bases of section 1 violations. Id. at 769-71.

An agreement need not be explicit to result in section 1 liability, Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 59-60 (1911), quoted in Copperweld, 467 U.S. at 785 (Stevens, J., dissenting), and may instead be inferred from circumstantial evidence. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41 (1954); Sweeney, 673 F.2d at 111; Milgram v. Loew's, Inc., 192 F.2d 579, 583 (3d Cir. 1951). Therefore, direct evidence of concerted action is not required.

In this case, the parties contest the propriety of summary judgment on the issue of concerted action in each of three different alleged fact patterns. Before addressing each fact pattern, we turn to a review of the summary judgment standard applicable to antitrust cases.

### B.

A district court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party moving for summary judgment need not produce evidence to disprove its opponent's claim, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), but it does bear the burden of demonstrating the absence of any genuine issues of material fact. Big Apple BMW, 974 F.2d at 1362. As in this case, when the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has failed to produce evidence sufficient to establish the existence of an element essential to its case. Celotex, 477 U.S. at 322.

In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the party opposing summary judgment. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When the moving party has pointed to material facts tending to show there is no genuine issue for trial, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

This traditional summary judgment standard applies with equal force in antitrust cases, Eastman Kodak Co. v. Image

Technical Services, Inc., 119 L.Ed.2d 265, 285 (1992); Big Apple BMW, 974 F.2d at 1362-63; however, the meaning we ascribe to circumstantial evidence will vary depending upon the challenged conduct.

For example, evidence of conduct which is "as consistent with permissible competition as with illegal conspiracy," without more, does not support an inference of conspiracy. Matsushita, 475 U.S. at 597 n.21, citing Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763-64 (1984); Big Apple BMW, 974 F.2d at 1363. See generally Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 186-87 (3d Cir. 1992). This is because mistaken inferences in such a context "are especially costly[;] they chill the very conduct the antitrust laws are designed to protect." Matsushita, 475 U.S. at 594; Monsanto, 465 U.S. at 763-64. In such cases, the Supreme Court has required plaintiffs to submit "evidence tending to exclude the possibility" of independent action, i.e., "direct or circumstantial evidence that reasonably tends to prove that [the alleged conspirators] `had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Monsanto, 465 U.S. at 764, quoting Sweeney, 637 F.2d at 111.

Conversely, if the alleged conduct is "facially anticompetitive and exactly the harm the antitrust laws aim to prevent," no special care need be taken in assigning inferences to circumstantial evidence. Eastman Kodak, 119 L.Ed.2d at 291; Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc., 826 F.2d 1335, 1339 (3d Cir. 1987) (Monsanto and Matsushita do not apply when

challenged action is overtly anticompetitive); Tunis Brothers Co., Inc. v. Ford Motor Co., Inc., 823 F.2d 49, 50 (3d Cir. 1987) (implying that Matsushita requires evidence tending to exclude the possibility of independent action only when the challenged conduct is as consistent with permissible competition as with illegal conspiracy). See also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432, 438-39 (9th Cir. 1990) ("the key to proper interpretation of Matsushita lies in the danger of permitting inferences from certain types of ambiguous evidence").[2]

## II.

With these standards in mind, we will review the evidence, granting reasonable inferences to the plaintiffs.[3]

Persons interested in decorating or redecorating their homes or offices typically view samples of wallpaper before purchasing. Recognizing this, retailers traditionally have made available to consumers the wallpaper sample books they purchase from manufacturers. They have also provided consumers with information through the use of promotional materials and showroom

---

[2]. Similarly, the analyses set forth in Monsanto and Matsushita do not apply when a plaintiff has offered direct evidence of concerted action. Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc., 826 F.2d 1335, 1338 (3d Cir. 1987). See also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432, 441 (9th Cir. 1990).

[3]. Our review does not include consideration of evidence which was the subject of the three pending motions to supplement the record. Nor will we consider citations to evidence in F. Schumacher & Co.'s brief which was not of record before the district court.

displays.  The purchase of sample books, establishment of a showroom and hiring of knowledgeable sales personnel are costly endeavors and, as one might expect, these costs are reflected in higher prices to consumers.  Manufacturers have encouraged retailers to incur these costs, however, because of a prevailing notion that their products sell better when marketed thus.

In recent years, a new breed of retailer has emerged. Some companies now accept orders from consumers all over the United States who call toll-free telephone numbers to order wallpaper after having availed themselves of the sample books, displays and assistance offered by conventional retailers. Today, purchasers may visit a conventional retailer's showroom, peruse the sample books, note the brands and product numbers of the patterns they like, and then go home and order wallpaper at a discount from an 800-number dealer.  This informed decision has, of course, been funded in part by retailers who will realize no return on their investment.  The 800-number dealer will arrange a "drop shipment" directly from the manufacturer to the purchasers' homes.[4]

Both conventional retailers and 800-number dealers are members of the National Decorating Products Association (the

---

[4].  In the nomenclature of the marketplace, these 800-number dealers are "free-riders," who reduce or eliminate service to create price competition but who benefit from services such as wallpaper sample books, salesperson advice and showroom displays paid for and provided by other, full-service retailers.  See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55 (1977); Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1376-77 (3d Cir. 1992).

"NDPA"), a trade association comprised of independent retailers who sell a variety of decorating products.  The NDPA has about 3,300 members who operate approximately 8,500 retail locations.  Its policy is established and its business conducted by an 18-member board of directors.  It sponsors a number of trade shows and educational programs for its members each year.  It also publishes a monthly industry news journal titled Decorating Retailer, and it formerly published a similar newsletter called Wallcovering Industry News.

A.

In the late 1970's and early 1980's, conventional retailers in the NDPA threatened to cease purchasing products from manufacturers who continued to do business with the 800-number dealers, whom they referred to as "pirates."  The NDPA itself actively campaigned against 800-number dealers by lobbying manufacturers to recognize the advantages of conventional retailing and by encouraging them to "level the playing field" between 800-number dealers and conventional retailers.

For example, Robert Petit, NDPA's executive vice president and chief executive officer, spoke to manufacturers, including Michael Landau, president of F. Schumacher & Co. ("FSC") on this subject.  Appendix ("App.") at 190-97, 202.  In February, 1983, Petit sent a letter on NDPA letterhead urging retailers to request from manufacturers sample books that did not reveal retail prices.  Depriving consumers of this information, Petit argued, would make it more difficult for them to avail themselves of an 800-number dealer's discount.  App. at 523.  The

NDPA also marketed a "sales piracy kit" for conventional retailers to use in disguising or concealing pattern numbers and price information on sample books so that consumers could not so easily acquire the information and then order elsewhere. App. at 271-73, 407.

In 1985, the Federal Trade Commission ("FTC") issued a complaint against NDPA because of these activities. In 1986, the parties entered into a consent decree which provided in part:

> NDPA . . . shall cease and desist from:
>
> A.    Conduct having the purpose or effect of:
>
> * * *
>
> Expressly or impliedly advocating, suggesting, advising, or recommending that any of NDPA's . . . members refuse to deal with any seller of wallcoverings on account of, or that any of NDPA's . . . members engage in any other act to affect, or to attempt to affect, the prices, terms or conditions of sale, or distribution methods or choice of customers of any seller of wallcoverings.

App. at 412. The consent decree also provided:

> IT IS FURTHER ORDERED that this Order shall not be construed to prevent NDPA . . . from publishing written materials or sponsoring seminars, or otherwise providing information or its members' views on topics including but not limited to cost accounting principles, and suggested prices and product identification numbers in wallcovering sample books to other sellers of wallcoverings, provided, however, that the information or views are not presented in a manner constituting a violation of any provision contained in Part II of this Order.

Id.[5]

In the aftermath of this settlement, as required by the consent decree, NDPA circulated a summary of the consent order in which it informed members that NDPA, as a group of competitors, was "already considered to be an `agreement.'" App. at 430. The NDPA guidelines for conducting meetings, drafted shortly before entry of the consent decree, also acknowledge that "a trade association is, by definition, a combination of competitors." App. at 740. The guidelines further provide that before a chapter officer delivers a speech or makes a presentation at a meeting, he or she should state that the views expressed are his or her own and not those of the NDPA or any chapter. App. at 743.

Since the entry of the consent decree, NDPA has modified its lobbying efforts to some extent, but it has not ceased them. The following passage from Petit's deposition testimony illustrates his view of the effect of the consent decree on NDPA's lobbying activities:

> We changed some of the things we were doing. One of the things that the [FTC] objected to us doing was, for example, having a sales piracy kit. Their feeling on that was that -- which we didn't agree with at all [--] that we were projecting a single way for the dealers to take action, and that they felt that this was bad. There was no problem

---

[5]. We may, of course, consider evidence of activity necessitating the entry of the consent decree, as well as the terms of the consent decree itself, as part of the overall picture, or potential evidence of a pattern of conduct. See Big Apple BMW, 974 F.2d at 1361; cf. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).

> with the FTC of enumerating numerous things
> that might be done, but not to specialize in
> one particular thing.  So, therefore, we did
> drop the sales piracy kit.
>
> * * *
>
> We took extra care in everything we did
> to make sure we lived up to that FTC
> agreement.

App. at 199.  Some NDPA members apparently believe NDPA has substantially altered its activities; one poll revealed that members have resigned because the NDPA is "not doing anything in regard to the sales piracy issue."  App. at 200.  Petit, however, has continued to impart to manufacturers, including Landau, his view of the advantages of conventional retailing over other methods of marketing wallcovering, such as 800-number sales. App. at 198.

B.

The sentiment against 800-number dealers continued to escalate even after the consent decree was entered.  Decorating Retailer published several letters from NDPA members, including some retailers who were former or current NDPA officers, urging action against the 800-number dealers.  Its editor, John Rogers, often solicited comment for the letters column by sending a variety of articles from a forthcoming issue to a number of people in the industry.  In each issue of Decorating Retailer, a standard statement appeared in the letters column apprising the reader that:  "The editor reserves the right to edit to fit space limitations or publishing policies.  Opinions expressed are those

of the writer and not necessarily those of the editor."  E.g.,
app. at 496.

Decorating Retailer and Wallcovering Industry News also
printed several news articles about 800-number dealers, most of
which used the term "pirates" among other characterizations to
describe them.  In May, 1988, one editorial -- a Perspective
column in Decorating Retailer -- stated that "[t]here are
increasing signs that the retailer's voice crying in the
wallcovering wilderness is being heard," and cited many
developments in the industry, such as "a sudden advent of bar
coding kits for retailer protection of sample book pattern
numbers," as signs that wallpaper suppliers were responding to
retailers' needs.  App. at 758.

C.

Undoubtedly, FSC, a leading manufacturer which had
always promoted the traditional method of marketing
wallcoverings, heard the complaints.  In July, 1988, it announced
a drop shipment surcharge on wallcovering deliveries directly to
consumers, to take effect in September, 1988.  App. at 298-99.
Under this new policy, FSC would impose a 7 percent surcharge on
every order requesting drop shipment.  Obviously, this would have
the effect of increasing the 800-number dealers' costs while
decreasing their ability to compete on the basis of price with
conventional retailers.

The minutes from FSC's management committee meeting in
April, 1988, state that it considered the policy to be a signal
to conventional retailers that FSC was trying to help them.

App. at 290.  A draft press release, later revised, identified the protection of dealers from piracy as one reason for the surcharge.  Compare app. at 298-99 with app. at 1364-65.  Minutes from September, 1989, reveal that the management committee viewed the drop shipment surcharge as "a good first step" against 800-number dealers.  App. at 304.

Beyond merely responding to dealer complaints, FSC also claimed that the surcharge was, in part, intended to recoup increased costs of drop shipments.  It did not, however, employ any particular formula or calculations to arrive at its surcharge figure or to determine its basis for recoupment.  Nor did it consult any source regarding or otherwise study such costs, although the record contains statements by another manufacturer indicating that his costs for drop shipments were no higher than for shipments to stores.  App. at 148-49, 622.

Predictably, retailers responded favorably to the imposition of the surcharge.  For example, in September, 1988, a Decorating Retailer editor's note responding to a letter about 800-number dealers' advertisements stated that "there are signs that telling your troubles to suppliers eventually will be heard and some remedy may result."  App. at 485.

Yet the retailers were not entirely satisfied.  In January, 1989, at a convention in Halifax, Nova Scotia, Petit revisited the issue of 800-number dealers and the problems they posed for the industry.  An August, 1989 memo shows that Petit spoke to at least one manufacturer about "the anger felt by the retailers in lack of support from the wallcovering industry."

App. at 185-86.  See also app. at 190-98, 201-07, 212-29, 404, 416-19, 693-99, 700.  During this period, NDPA officer Clyde Morgan also expressed "concern about the 800-number and the effect it was having on me" at a meeting of industry leaders. App. at 183.

The fall 1989 planning session at FSC also reflected continuing concerns about 800-number dealers.  In September, 1989, soon after an NDPA meeting, Landau stated at a management committee meeting that the surcharge was a good first step but that other measures were necessary.  App. at 304.  An October, 1989 memo asked whether "we [should] make another anti-pirate move?  If so, what?"  App. at 793.  In November, 1989, Landau reported to the management committee what he had learned at an NDPA trade show:  "retailers squeezed by mass market & 800 #'s." App. at 307.  The minutes from that committee's meeting also include the following entry:  "800 #s:  Meeting with attorneys next week to formulate new strategy."  App. at 309.

D.

In January, 1990, FSC announced a local trading policy to be implemented in March, 1990.  App. at 694-97.  FSC dealers would be prohibited from selling FSC products outside of their "local trading area," thus effectively prohibiting 800-number dealers from selling FSC's products nationwide through their toll-free telephone numbers.  Immediately after this policy was announced, Petit circulated a copy of it to the NDPA board of directors, saying, "This is a major step forward in our battle against the 800-number operators."  App. at 693.  He also sent a

letter to Landau on NDPA letterhead stating, "On behalf of the members of our decorating products associations, I want to express our appreciation of your actions." App. at 700.

Five FSC executives testified that the purpose of the local trading area policy was to ensure that FSC dealers would realize a return on their investments in sample books and other FSC overhead. App. at 1215, 1218-19, 1222-23, 1238-40, 1249-50, 1340-43, 1520-22, 1550-52. FSC's vice president of sales testified that if FSC had not taken action against the 800-number dealers, it "would continue to have resistance to purchasing sample books with the piracy issue." App. at 691. Indeed, there were several references in planning meetings to safeguarding against free riders and supporting conventional retailers.

Shortly thereafter, according to Decorating Retailer and Wallcovering Industry News articles, NDPA president John Wells spoke at a trade show in Anaheim, California. The articles describe Wells as urging that "[i]nsisting on supplier support rather than coding books is the answer to piracy problems besetting wallcovering retailers." App. at 440. At the same show Petit, according to one of the articles, applauded manufacturers' efforts to fight 800-number dealers. Id. In accordance with NDPA guidelines, Wells specifically stated that his views were his own as an independent retailer, but the articles refer both to him and to Petit in their NDPA capacities.[6]

---

[6]. FSC and NDPA argue that these articles constitute inadmissible hearsay. Plaintiffs respond that the articles are

In May, 1990, Rogers wrote a Perspective column in which he discussed the retailers' opposition to 800-number dealers, reviewed some of the methods retailers had adopted to guard against 800-number dealers' taking their business, and stated, "ultimately, the answer for the individual dealer is that given by Wells: `I will support those who support me.'" App. at 167. Rogers testified that while the Perspective column does not represent the policy of the NDPA, to his knowledge there has not been an occasion when a comment published in it has contravened NDPA's policies.

Both before and after it instituted the policies in question, FSC received letters from retailers urging it to take action against the 800-number dealers. Meanwhile, during this period the FTC repeatedly responded to inquiries from plaintiffs with the assurance that, in its view, NDPA was in compliance with the consent decree entered into in 1986.

### E.

Anti-800 number dealer sentiment was not confined to retailers' ranks; manufacturers were also discussing 800-number dealers among themselves. Between 1988 and 1990, wallpaper manufacturers discussed 800-number dealers at meetings of the

(..continued)
admissible as statements of NDPA, having been published in its own publications. See Fed. R. Evid. 801(d)(2) (statements are not hearsay if they are offered against a party and are statements of which the party has "manifested his adoption or belief in its truth"). We agree: an employee of NDPA had to have written these articles, which were adopted by NDPA when it published them in Decorating Retailer and Wallcovering Industry News. Wells' statements as reflected in the articles are, therefore, admissible.

Wallcovering Manufacturers Association ("WMA"), an organization in which Landau served as a member of the board of directors.

In April, 1988, for example, Landau reported to the FSC management committee that there had been "extensive discussion pirate situation" at the WMA meeting in Hilton Head. App. at 292. Manufacturers also discussed bar-coding, in the context of either "pirate-proofing" sample books or standardizing labels and shipping containers. FSC discussed with other manufacturers steps they were taking to combat 800-number dealers, such as engaging in cooperative advertising, imposing state sales taxes and imposing local trading policies.

800-number dealers were also discussed at conventions sponsored by a chain of wallcovering stores called Wallpaper-To-Go. App. at 313, 315. FSC officials and other wallcovering manufacturers deny that they agreed with other manufacturers to take action against the 800-number dealers, however. See FSC's brief at 42.

Other manufacturers reacted against the 800-number dealers in much the same fashion as FSC did. In April, 1988, the owner of one company wrote an open letter to manufacturers about 800-number dealers. In it, he suggested that a task force be formed to establish an "effective, standard and universal method of `[p]irate-[p]roofing' sample books." App. at 884. At least one manufacturer took a step in that direction and coded its sample books so that style and price information could not easily be discerned. App. at 139-41. Another imposed a local trading policy, app. at 130-38, 151, and another tried, but discontinued,

a cooperative advertising program with conventional retailers. App. at 127-28. By August, 1989, two more manufacturers had imposed a drop shipment surcharge. App. at 160, 789.

                                III.

In May, 1990, plaintiffs filed suit against NDPA and FSC. Their amended complaint, filed in January, 1991, contained twelve counts, the first four of which provide the central focus for this appeal. In Count I, they alleged that "[t]he individual retail wallcovering dealers, acting through the NDPA" violated section 1 of the Sherman Act by entering into a horizontal conspiracy to eliminate the competition posed by 800-number dealers. In Count II, the plaintiffs alleged that in response to the pressure exerted by the NDPA, FSC joined NDPA in a vertical conspiracy similarly designed to thwart competition. In Counts III and IV, the plaintiffs alleged that FSC entered into a conspiracy with other, unnamed, wallcovering manufacturers aimed at eliminating 800-number dealers. Specifically, plaintiffs challenged FSC's imposition of the drop shipment surcharge and its adoption of a local trading policy as being directed at them.[7]

Plaintiffs also alleged a claim under section 2(d) of the Clayton Act, 15 U.S.C. § 13(d); state-law antitrust and

_____

[7]. Their amended complaint indicates that plaintiffs originally were concerned about two additional FSC policies: FSC's failure to discuss cooperative advertising possibilities with 800-number dealers though it did so with conventional retailers, and FSC's charging state sales tax on drop shipments. These policies, however, are not subjects of this appeal.

restraint of trade violations; tortious interference with contracts and prospective contractual relations; fraud and misrepresentation; defamation and commercial disparagement and breach of contract. In turn, FSC asserted various counterclaims against the 800-number dealers.

The district court granted defendants' motions for summary judgment on Counts I through IV and granted both plaintiffs and defendants summary judgment on various other claims and counterclaims. Thereafter, the parties settled those claims which had not been disposed of, and plaintiffs filed this appeal challenging the district court's decision on Counts I through IV, the state-law antitrust claims, the tortious interference claim and the defamation claim against NDPA.

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, and we exercise jurisdiction pursuant to 28 U.S.C. § 1291.[8] In our analysis of each of the

[8]. NDPA and FSC argue that we lack jurisdiction over this appeal because the district court failed to enter a judgment on a separate document in accordance with Rule 58 of the Federal Rules of Civil Procedure and had not yet awarded costs in accordance with Rule 54(d) of the Federal Rules of Civil Procedure.

In Bankers Trust Co. v. Mallis, 435 U.S. 381 (1978) (per curiam), however, the Supreme Court recognized that the rules of civil procedure requiring entry of judgment on a separate document should be interpreted in a common-sense fashion. "If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal." Mallis, 435 U.S. at 385-86. See also International Brotherhood of Teamsters v. Western Pennsylvania Motor Carriers Assoc., 660 F.2d 76, 80 (3d Cir. 1981). The district court's failure to enter judgment in accordance with the dictates of Rule 58 appears to stem from oversight. No other plausible suggestion has been advanced. Thus, we reject this jurisdictional argument.

plaintiffs' Sherman Act claims, which allege three distinct antitrust theories of liability, we proceed from the premise that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).

IV.

At Count I, in which plaintiffs named only NDPA as a defendant, they alleged that conventional retailers, acting through the NDPA, conspired to pressure manufacturers to eliminate them from the marketplace. The district court examined the record for evidence of "officially sanctioned NDPA activity," found none, and ruled that plaintiffs could not meet the "concerted action" requirement because "[t]he NDPA can only act pursuant to a resolution from its board and no such resolution has been identified." App. at 37. We will reverse.

A.

It is both uncontested and uncontestable that NDPA is an association of competing wallpaper dealers. As such, when NDPA takes action it has engaged in concerted action so as to trigger potential section 1 liability. Weiss, 745 F.2d at 816 (..continued)

As to costs, we note that the parties' stipulation of settlement, which disposed of those counts as to which the district court had not granted summary judgment and which was entered as an order by the district court, provided that each party was to bear its own costs, thus implicitly if not actually resolving any Rule 54(d) issue.

(hospital executive committee's actions are concerted action within the meaning on section 1).  "[A]ntitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form."  Weiss, 745 F.2d at 815.  The actions of a group of competitors taken in one name present the same potential evils as do the actions of a group of competitors who have not created a formal organization within which to operate.  See id. at 816 ("[w]here such associations exist, their actions are subject to scrutiny under section 1 . . . in order to insure that their members do not abuse otherwise legitimate organizations to secure an unfair advantage over their competitors").  See also Silver v. New York Stock Exchange, 373 U.S. 341 (1963); Associated Press v. United States, 326 U.S. 1 (1945).

We agree with NDPA's contention, however, that NDPA can only be held liable for concerted action if it acted as an entity.  See Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96, 117–18 (3d Cir. 1988) (Weiss holds that when a group of competitors "acts as a body, it constitutes a `combination'").  In Nanavati, we held that although the actions of a hospital executive committee might constitute concerted action, the committee does not engage in concerted action when it does not "act[] as an entity in furtherance of the conspiracy."  Id. at 119.  As we explained there:

> Our conclusion in Weiss was premised on the concept that where individual actors take actions as a group, they are a combination for the purposes of those actions.  Where no group action is taken, no such combination can exist.  In short, we did not hold in Weiss that because the actions of the medical

> staff constitute the actions of a
> combination, even where there is no
> allegation that the staff acted as a group,
> the `contract, combination or conspiracy'
> requirement has been met.  Such a group is a
> combination as a matter of law only for the
> actions it takes as a group.

Id.

In Nanavati, the plaintiff did not maintain that the executive committee took any action as a group.  Id.  Instead, he pointed to the actions of medical staff members who were not on the executive committee as the basis for his claim.  He argued that the record contained evidence of a boycott against him by members of the medical staff, so the jury had not erred in finding that the executive committee had participated in the boycott.  Our search for evidence that members of the executive committee had acted in furtherance of the boycott yielded none; thus, we affirmed the district court's grant of judgment n.o.v. to the executive committee.

Nanavati teaches that concerted action does not exist every time a trade association member speaks or acts.  Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise,[9] among

---

[9].    It would be incorrect to require an official board resolution, or other officially sanctioned activity, to impose liability on NDPA.  Recognizing that perpetrators of antitrust violations are often sophisticated businessmen, courts regularly permit agreements to be shown by circumstantial evidence.  See Big Apple BMW, 974 F.2d at 1364; Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41 (1954).

members of the association.  See generally Nanavati, 857 F.2d at 119-20.

Judicial scrutiny of alleged concerted action, undertaken to determine whether it was the result of an agreement, is an intricate endeavor.  In the straightforward case, such as when a stock exchange requires disconnection of a nonmember's private telephone wire, or a hospital executive committee votes to deny staff privileges to a member, the action is obviously a result of an agreement which is stamped with the imprimatur of the association by a vote or passage of a resolution.  See, e.g., Silver, 373 U.S. at 347; Weiss, 745 F.2d at 816.  We can hardly say, however, that this case falls within that genre.

Here, plaintiffs rely on American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556 (1982), to argue that NDPA took concerted action when its officers spoke out in protest against the 800-number dealers' business methods and when NDPA publications included letters complaining about 800-number dealers.  In Hydrolevel, the Supreme Court, relying on general principles of agency law, determined that the American Society of Mechanical Engineers ("ASME") could be held liable for the actions of its officers and agents taken with apparent authority.  Writing for the majority, Justice Blackmun held that imposing liability based upon apparent authority comported with the intent of the antitrust laws because ASME possessed great power and the codes and standards it issued influenced policies and affected entities' abilities to do business.  Hydrolevel, 456

U.S. at 570. "When it cloaks its subcommittee officials with the authority of its reputation, ASME permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace." Id. at 570-71. Imposing antitrust liability on the association for the actions of its agents would encourage ASME to police its ranks and prevent the use of associations by one or more competitors to injure another. See generally id. at 571-73. See also M. Boudin, Antitrust Doctrine and the Sway of Metaphor, 75 Geo. L. J. 395, 417-18 (1986).[10]

In deciding Hydrolevel, the Court rejected ASME's argument that it should not be held liable unless its agents had acted with an intent to benefit it. This argument was irrelevant, the Court held, in part because "[w]hether they intend to benefit ASME or not, ASME's agents exercise economic power because they act with the force of the Society's reputation behind them." Hydrolevel, 456 U.S. at 574. The Court viewed the imposition of liability regardless of the agents' intent as more

_____

[10]. Judge Boudin notes that the Supreme Court in Hydrolevel viewed ASME as an "extra-governmental agency" regulating its own industry. American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 570 (1982). See M. Boudin, Antitrust Doctrine and the Sway of Metaphor, 75 Geo. L. J. 395, 417 (1986). Indeed, Hydrolevel and many other trade association cases have focused on this role and on associations' standard-setting or industry-regulating activities. See e.g. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284 (1985); Moore v. Boating Industry Assoc., 819 F.2d 693 (7th Cir. 1987). See generally ABA Antitrust Section, Antitrust Law Developments 86-91 (3d ed. 1992). Notably, the case before us does not involve standard-setting or industry-regulating activity on NDPA's part.

consistent with the purposes of antitrust law, since this would encourage ASME to police its agents so as to prevent the anticompetitive effects of their using its name and power even in individual efforts at restraining trade. Id.

The issue presented here, however, is markedly different. In Hydrolevel, the plaintiff had named three defendants in its conspiracy claim. Although it is difficult to discern the exact contours of the alleged conspiracy from the Hydrolevel opinion, it is quite clear that the plaintiff there was not seeking to hold ASME liable for concerted action solely on the basis of actions taken by one official with apparent authority. The conspiracy alleged apparently was between the chairman of an ASME standards committee and the plaintiff's primary competitor; the question before the Court was whether ASME could be held liable for its agent's anticompetitive activity in participating in the conspiracy even though no one else at ASME had authorized the violation. Because a conspiracy was alleged to have taken place between the ASME official and another conspirator, the Court did not address the question of whether an agent with apparent authority can cause a trade association to be held liable for violating the antitrust laws by taking action on behalf of the association which would have amounted to such a violation if the association itself, as a combination of competitors, had undertaken it.

We believe that the Hydrolevel rule that an association's economic power may justify its being held liable for the actions of its agents cannot be extended to defeat the

"concerted action" requirement of section 1. Imposing liability on an association, as we did in Weiss, does not abolish or diminish the first element of section 1 liability; it merely recognizes that a group of competitors with a unity of purpose are engaged in concerted action, whether or not they act under one name. As we explained in Nanavati, in the absence of a co-conspirator, an association's actions satisfy the concerted action requirement only when taken in a group capacity. The potential for antitrust liability arising from the concerted action of a group such as a trade association, as that liability may be established by the apparent authority of an agent to speak on behalf of and bind that association, has not yet been fully explored in a trade restraint case.[11] In Hydrolevel, for example, the Court described the concept of apparent authority as one which results in liability on a principal's part for an agent's torts. Hydrolevel, 456 U.S. at 565-66. Thus, if an agent commits fraud, his or her principal is liable if he or she

---

[11]. There is, however, authority for the proposition that a trade association, in and of itself, is a unit of joint action sufficient to constitute a section 1 combination. See G.D. Webster, The Law of Associations § 9a.01[1], 9A3-4 (1991) ("There is no question that an association is a `combination' within the meaning of Section 1 of the Sherman Act. Although a conspiracy requires more than one person, an association, by its very nature a group, satisfies the requirement of joint action. Thus, any association activity which restrains interstate commerce can be violative of Section 1 even if no one acts in concert with the association."); Stephanie W. Kanwit, FTC Enforcement Efforts Involving Trade and Professional Associations, 46 Antitrust L.J. 640, 640 (1977) ("Because trade associations are, by definition, organizations of competitors, they automatically satisfy the combination requirements of § 1 of the Sherman Act.")

acted with apparent authority to act on behalf of that principal.
Id. at 566. Similarly, if an agent acting with apparent
authority makes misrepresentations that cause pecuniary loss to a
third party or is "guilty of defamation," the principal is
liable. Id. See also id. at 568; see generally Restatement
(Second) of Agency §§ 215 et seq. (a principal is liable for the
"torts of its servants" and for its "servants' tortious
conduct"). Applying that general principle to the antitrust area
leads us to conclude that a principal will be liable for an
antitrust violation if an agent acting with apparent authority
violates the antitrust laws, as one did in Hydrolevel by
conspiring with another person. See Hydrolevel, 456 U.S. at 572
(speaking in terms of finding "ASME . . . civilly liable for the
antitrust violations of its agents acting with apparent
authority" (emphasis added)).

We are dealing here, however, with a trade association
which is charged with violating the antitrust laws by
constituting a horizontal conspiracy to eliminate the 800-number
dealers. Clearly, an association, as a combination of its
members, can violate the antitrust laws through such a
conspiracy. This was the nature of the claim which prompted the
FTC to initiate its complaint against the NDPA in 1985. The
singular characteristic of plaintiffs' allegations here is that
the association is now charged with acting through agents whom it
has imbued with apparent authority. It is uncontested that the
NDPA is highly sophisticated and possesses significant market
power; it is unrealistic to think that such a sophisticated trade

association, wary of the antitrust laws, would ingenuously act as an association in endorsing the type of activity forbidden by the consent decree.

In considering the antitrust implications of this situation, though, our first concern must be whether plaintiffs' allegations demonstrate an antitrust violation. Specifically, we must determine whether statements by NDPA officers demonstrate that NDPA recommended that its members refuse to deal with any seller of wallcoverings on account of the prices or distribution methods of that seller. We must also determine whether the evidence could show that the NDPA officers' statements were made with the apparent authority of the membership of the NDPA for those officers to act as the NDPA's agents. This method of analysis is consistent with Hydrolevel, which instructs that a court must find an antitrust violation before deciding whether to hold an association liable for that violation by virtue of the perpetrator's apparent authority.[12]

B.

Having focused our inquiry not just upon whether Petit or other NDPA agents might have acted with apparent authority but also upon whether their actions could constitute an antitrust

---

[12]. We do not, however, require that members of NDPA actually ratify an agent's actions before NDPA may be held liable for them. Such a rule not only would be unrealistic, see supra note 9, but it also would contravene the Court's admonition that agents of trade associations acting with apparent authority exercise the associations' economic power regardless of whether they are acting to benefit the associations. Hydrolevel, 456 U.S. at 573-74.

violation in the absence of that authority, we believe that a rational jury could find for the plaintiffs if the evidence presented to us is proven at trial. As noted previously, Petit has acknowledged that since the entry of the FTC consent decree he has continued to urge manufacturers to take steps to hinder 800-number dealers in the conduct of their business. App. at 199, 407. He described himself as conveying "the concerns of NDPA," app. at 191, and he stated that he views it as part of his job to convey those concerns. App. at 192. Additionally, once FSC announced its local trading policy, Petit circulated a copy of it to the NDPA board of directors along with a memorandum which could be read as triumphant. App. at 693. From this, a rational juror could infer that Petit viewed himself as being authorized by the NDPA to make the statements he made.

Moreover, the record contains evidence from which a rational juror could also infer that Petit's actions represented concerted action. That is, a jury could find that, while representing NDPA, Petit went beyond merely voicing complaints to manufacturers to actually coercing (or attempting to coerce) them into cooperating in eliminating 800-number dealers. There is some evidence that Petit emphasized to manufacturers with whom he met "the anger felt by the retailers in [the] lack of support from the wallcovering industry." App. at 185. See also app. at 190-98, 218-29. Such evidence, when viewed against the existing backdrop of urgings from NDPA officers and editors that retailers should support only those manufacturers who supported them, could imply a threat of a retailers' boycott if manufacturers did not

take steps to help eliminate 800-number dealers from the marketplace.

In sum, nothing in either the antitrust laws or the FTC consent decree prohibits NDPA from voicing complaints. Granting all reasonable inferences to the plaintiffs, however, a rational jury could find that NDPA did more than serve as a conduit for members' complaints in this case. It could, for example, find that NDPA, acting through its officers, threatened a retailers' boycott of manufacturers and thus could hold NDPA liable for a section 1 violation. For these reasons, we will reverse the district court's grant of summary judgment at Count I.

                                 V.

At Count II, plaintiffs alleged that FSC responded to pressure from the NDPA by conspiring with it to eliminate 800-number wallpaper dealers from the marketplace. Their allegations flow directly from evidence of FSC's taking actions to eliminate free riders from the marketplace in response to conventional retailers' complaints (and, possibly, threats of boycott). There is no dispute that plaintiffs are free riders, and there is no question as to the legitimacy of a manufacturer's desire to rid the marketplace of free riders. See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 55 (1977); cf. Big Apple BMW, 974 F.2d at 1377-78. Therefore, the scenario which is the focus of Count II is as consistent with procompetitive activity as with allegedly illegal activity. Monsanto, 465 U.S. at 763.

In _Monsanto_, a case which also involved an alleged conspiracy to terminate a dealership relationship because of other dealers' complaints, the Supreme Court noted:

> Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about `in response to' complaints, could deter or penalize perfectly legitimate conduct. [C]omplaints about price cutters `are natural -- and from the manufacturer's perspective, unavoidable -- reactions by distributors to the activities of their rivals.' Such complaints . . . `arise in the normal course of business and do not indicate illegal concerted action.' . . . Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market.

_Monsanto_, 465 U.S. at 763-64. Thus, we exercise a measure of caution when drawing inferences from such facts; "a fine line demarcates concerted action that violates antitrust law from legitimate business practices." _Big Apple BMW_, 974 F.2d at 1363, citing _Monsanto_, 465 U.S. at 762-64. _See also_ _Matsushita_, 475 U.S. at 597 n.21.[13]

---

[13]. In _Matsushita_, the Supreme Court, in the context of an alleged horizontal price-fixing conspiracy, ruled that the case should not proceed to trial because the petitioners lacked a rational motive to conspire in the manner alleged. It also noted, however, that its ruling was not meant to "imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in _Monsanto_ . . . establishes that conduct that is

In Big Apple BMW, plaintiffs alleged that BMW of North America, Inc. ("BMW") had refused to grant automobile dealerships to them because other dealers had complained about plaintiffs' high-volume, deep-discount business methods. BMW asserted a variety of legitimate business reasons for its actions, including a concern about plaintiffs being "free-rider" dealers. Plaintiffs, however, presented evidence that they would not have posed the "free-rider" problem BMW feared, see Big Apple BMW, 974 F.2d at 1377, and that a person with the same advertising tactics as theirs (high-volume, deep-discount "sellathons") had been granted a BMW franchise. Id. at 1378. They also presented evidence tending to discredit the other reasons BMW proffered to support its refusal to grant them a franchise. Id. at 1377-80.

We reversed the district court's grant of summary judgment because plaintiffs had advanced evidence tending to exclude the possibility of BMW's having acted independently from the complaining dealers. They had "countered each alleged reason with evidence that both discredits BMW NA's witnesses and provides independent support for the [plaintiffs'] claim that BMW NA and its dealers acted in concert to repel" plaintiffs' competition. Id. at 1380.

Similarly, in Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564 (3d Cir. 1986), we reversed a grant of summary judgment because defendant General Motors Corporation

(..continued)
as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." Matsushita, 475 U.S. at 597 n.21.

("GMC") first favorably viewed plaintiff's franchise application, then heard its dealers' disapproval and threatened non-cooperation, and then denied the application. GMC had not expressed concern about the plaintiff's franchise application until it heard its dealers' complaints. We held that "we must infer that [the dealers'] conduct contributed to GMC's decision not to award [the plaintiff] the Buick franchise." Arnold Pontiac, 786 F.2d at 573.

In marked contrast to Big Apple BMW and Arnold Pontiac, here the 800-number dealers concede that they are free riders. It is also undisputed that FSC has for years sold sample books and promotional materials and has encouraged its dealers to invest in these and other overhead costs in order to provide better service to their customers. A jury could find that, because FSC had for years recognized the importance of selling service, its actions aimed at 800-number dealers were entirely consistent with its previously held view of its own self-interest and do not tend to demonstrate that it acted in conjunction with anyone in implementing its policies.

On the other hand, however, the record also contains evidence that may indicate concerted action between FSC and NDPA. Specifically, plaintiffs highlight two examples of what they claim to be FSC's assertion of pretextual reasons for its actions. If FSC in fact advanced reasons for its actions which were pretextual, this would tend to support an inference that it acted as part of a conspiracy with conventional retailers. See Big Apple BMW, 974 F.2d at 1374-80.

First, plaintiffs point to evidence in FSC's management committee minutes which contrast the "objective" of its drop shipment surcharge ("To make statement to industry that we are trying to help them") with the "rationale" for this surcharge ("To protect legitimate customers, [t]o increase margins in this area"). App. at 290. They also point to a parallel distinction between FSC's original and published press releases announcing the surcharge. The original press release stated:

> In direct response to retailer requests, we at F. Schumacher & Company are proud to announce that we will assertively support our dealers in their local trading areas and protect them from sales piracy by adding a seven percent surcharge onto all drop shipments . . . While bar coding is a breakthrough for the industry in terms of product identification we feel that it alone is not an entirely effective deterrent against sales piracy . . . . Our approach attacks the problem at its root and makes the accounts who drop ship feel the effects, rather than leaving the responsibility of policing to the retailers.

App. at 298-99. The final press release stated that the policy was not designed to combat "piracy" but rather to

> help insure that our consumers receive the best possible service and that our wallcovering brands are supported in the most effective and appropriate manner at retail . . . This policy seeks to encourage all dealers to concentrate their selling efforts exclusively within their own trading areas where they can provide service directly to the consumers to whom they sell the product.

App. at 486.

Plaintiffs argue that these inconsistencies in and contrasts between the internal and the public explanations of the

drop shipment policy reveal that FSC was attempting to disguise the true reason for its actions. We agree; while the two statements and the two press releases could be seen as being in harmony with FSC's explanation that it took the action it did to protect the investments made by traditional retailers, a jury might view FSC's apparent desire to use more genteel language when explaining its actions to the public as implying a sinister motive.

Second, plaintiffs argue that although FSC acknowledges that dealer complaints were part of the reason for its surcharge, at one time it also stated that the surcharge was intended in part to recoup increased costs associated with drop shipments. FSC did not, however, use mathematical calculations to arrive at its surcharge figure; it neither consulted anyone regarding nor studied such costs, and the record contains statements by another manufacturer indicating that his costs for drop shipments were no higher than for shipments to stores. This, plaintiffs argue, underscores the arbitrariness of the surcharge and evinces FSC's true, sinister motive.

A lack of market research, while perhaps adding luster to plaintiffs' contention that the surcharge was arbitrarily determined, does not necessarily invite an inference that FSC's statement was an attempt to conceal a conspiracy. It is true that the seven percent figure did not reflect an analysis of FSC's costs; however, this does not indicate that FSC was not pursuing its self interests in imposing it. Nevertheless, viewing this evidence in conjunction with the press releases and

the retailer pressure on FSC, it is not an implausible conclusion that FSC may have imposed the surcharge without first undertaking mathematical calculations because it had agreed with others to impose the surcharge whether it made economic sense or not.

Accordingly, because there is some evidence from which a rational jury could infer that FSC advanced pretextual reasons for its policies, and might in turn infer that FSC had acted in concert with NDPA in deciding to implement policies designed to injure 800-number dealers, we will reverse the district court's grant of summary judgment at Count II.

VI.

At Counts III and IV, plaintiffs allege that FSC conspired with other wallcovering manufacturers to injure the 800-number dealers. We will affirm the district court's grant of summary judgment as to these counts because plaintiffs' evidence tends to show only an opportunity to conspire, not an agreement to do so.

Certainly, direct evidence (or a direct inference) of an agreement between FSC and other manufacturers regarding 800-number dealers could enable plaintiffs to show concerted action. The evidence of an agreement, however, amounts to nothing more than communications on the 800-number subject. Communications alone, although more suspicious among competitors than between a manufacturer and its distributors, do not necessarily result in liability. Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 894 (3d Cir. 1981). As we have observed, it is only when those communications rise to the level

of an agreement, tacit or otherwise, that they become an antitrust violation.

Thus, plaintiffs are left to argue that FSC and other manufacturers conspired based upon their parallel conduct. "[P]roof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but . . . such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action." Bogosian v. United States, 561 F.2d 434, 446 (3d Cir. 1977). The circumstances necessary to support such an inference are: (a) a showing that the defendants acted contrary to their own economic interests; and (b) satisfactory demonstration of a motivation to enter an agreement. Id., citing Venzie Corp. v. United States Mineral Products Co., Inc., 521 F.2d 1309, 1314 (3d Cir. 1975). See also Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224 (3d Cir. 1993); Schoenkopf v. Brown & Williamson Tobacco Corp., 637 F.2d 205, 208 (3d Cir. 1980).

In particular, when evidence shows communications which provided an opportunity for agreement, a plaintiff must still produce evidence permitting an inference that an agreement in fact existed. Venzie, 521 F.2d at 1313. The evidence must give rise to more than speculation. Id.

In Venzie, for example, plaintiffs contended that two defendant corporations had agreed to refuse to sell fireproofing material to them. The record contained evidence that defendants

had made numerous telephone calls, at least one of which concerned the plaintiffs, to each other and had met for lunch. We held that it was for the jury to assess the credibility of the defendants' assertions that they had not discussed or agreed upon the alleged refusal to deal, but, even disregarding statements to that effect, all that plaintiffs' evidence proved was an opportunity for an agreement, which would not suffice to support a verdict. Plaintiffs had failed to highlight evidence supporting an inference that an agreement in fact existed and thus could not support a verdict. Venzie, 521 F.2d at 1312. See also Tose, 648 F.2d at 895.

In contrast, a particularly detailed memorandum of a telephone call can give rise to a reasonable inference of agreement. In Apex Oil Co. v. DiMauro, 822 F.2d 246, 254 (2d Cir 1987), for example, the plaintiff survived a summary judgment motion by advancing evidence in the form of detailed memoranda indicating the existence of an agreement.

In this case, it is conceded that manufacturers discussed 800-number dealers, and actions they were taking concerning them, at conventions. The evidence of communications thus falls somewhere between Venzie, in which there were no notations of the subject matter of the conversations, and Apex Oil, in which the notations implied an agreement. Plaintiffs, however, seek to infer an agreement from those communications despite a lack of independent evidence tending to show an agreement and in the face of uncontradicted testimony that only informational exchanges took place. Without more, they cannot do

so.  Cf. Tose, 648 F.2d at 894 (mere disbelief of contrary testimony does not prove agreement).

We emphasize that unlike actions such as price-cutting, which provide the classic example of conscious parallelism, FSC's action was in its economic interests.  It is simple syllogistic reasoning that if FSC was aware that most of its dealers were conventional retailers, and believed that its products sold better in the conventional setting, it would conclude that it was in its economic interests to keep the conventional retailers satisfied.  That FSC may have foregone some short-term opportunity for sales to 800-number dealers does not suffice to show it acted contrary to its self-interests when its actions clearly would benefit it economically in the long term.  Tose, 648 F.2d at 895; see P. Areeda, Antitrust Law § 1415e (1986).  FSC's listening to retailers' complaints in no way implies that there was an agreement among manufacturers to do the same.  See Venzie, 521 F.2d at 1314 ("[t]he absence of action contrary to one's economic interest renders consciously parallel business behavior `meaningless, and in no way indicates agreement,'" quoting Turner, The Definition of Agreement Under the Sherman Act:  Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 681 (1962)); see also Houser v. Fox Theatres Management Corp, 845 F.2d 1225, 1232-33 (3d Cir. 1988) (requiring both actions contrary to economic interests and motive to conspire).

VII.

Remaining for disposition are the plaintiffs' state-law antitrust and tort claims.  To the extent that their state-law

antitrust claims mirror their federal antitrust claims, we will dispose of those claims in like manner.  We will affirm the district court's disposition of the state-law tort claims.

A.

In Count VI, plaintiffs alleged that the defendants violated Pennsylvania antitrust law by engaging in the activity alleged as the basis of Counts I through IV.  This allegation rises or falls with plaintiffs' federal antitrust claims.  See Collins v. Main Line Board of Realtors, 304 A.2d 493 (Pa. 1973); Schwartz v. Laundry and Linen Supply Drivers' Union, 14 A.2d 438 (Pa. Super. 1940); plaintiffs' brief at 45; FSC's brief at 47-48.  Therefore, our decision with respect to Counts I through IV disposes of Count VI as well.  Count VI survives to the extent that it is directed toward the theories of liability upon which Counts I and II are based; to the extent it is a counterpart of Counts III and IV, however, we will affirm the district court's grant of summary judgment.

B.

In Count VII, plaintiffs alleged that FSC and NDPA tortiously interfered with their existing and prospective contracts.  We have previously noted that the "factual underpinnings" of such intentional interference claims generally "are intertwined with" the antitrust claims they accompany, see Big Apple BMW, 974 F.2d at 1381-82, but that statement does not imply that claims of intentional interference with contractual relations must always survive summary judgment if a plaintiff's antitrust claims survive.  It merely implies what to some might

be obvious -- that antitrust violations or other actions in restraint of trade are examples of improper conduct. We are not bound, therefore, to reversing on the tortious interference claims merely because we are reversing on two of plaintiffs' antitrust claims. Instead, we will affirm the grant of summary judgment to defendants on Count VII because plaintiffs have failed to demonstrate that they would be able to present evidence tending to prove each element of their tortious interference claims at trial.

To establish a claim of tortious interference with existing contracts, plaintiffs must prove that the defendants intentionally and improperly interfered with their performance of contracts with third persons. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1388 (3d Cir. 1991); Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978). To prove their claims of tortious interference with prospective contractual relations, plaintiffs likewise must prove, inter alia, the existence of prospective contracts. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979). A prospective contract "is something less than a contractual right, something more than a mere hope[ ]" id.; it exists if there is a reasonable probability that a contract will arise from the parties' current dealings. Glenn v. Point Park College, 272 A.2d 895, 898-99 (Pa. 1971).

Plaintiffs have failed to identify with sufficient precision contracts and prospective contracts which were interfered with by the defendants. They have likewise failed to

identify an existing contract which was terminated because of the defendants' actions.  Nor have they demonstrated a reasonable probability that they would have entered into prospective contracts with third parties but for defendants' alleged interference.  See General Sound Telephone Co., Inc. v. AT&T Communications, Inc., 654 F. Supp. 1562, 1565-66 (E.D. Pa. 1987).  This case differs in this respect from Big Apple BMW, in which we reversed a grant of summary judgment on claims of intentional interference with contractual relations solely because their "factual underpinnings" were "intertwined with the antitrust claims" as to which we were reversing a grant of summary judgment.  In Big Apple BMW, the plaintiffs had specified transactions in which they claimed defendants' actions had deprived them of specific automobile dealership franchises.  In contrast, in this case, plaintiffs have failed to advance more than speculation to support their claim of tortious interference; therefore, we will affirm the district court as to this count.

C.

Finally, in Count X, plaintiffs alleged that the NDPA defamed them by publishing articles and editorials referring to 800-number dealers as "pirates."  Under Pennsylvania law, a statement is defamatory if it "`tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990), quoting Birl v. Philadelphia Electric Co., 167 A.2d 472, 475 (Pa. 1960).  To prove their

claim, plaintiffs must show: (1) the defamatory character of the statements; (2) publication by NDPA; (3) the statements' application to the plaintiffs; (4) an understanding by readers of the statements' defamatory meaning; and (5) an understanding by readers of an intent on the part of NDPA to refer to the plaintiffs. 42 Pa. Cons. Stat. Ann. § 8343(a) (1982); U.S. Healthcare, 898 F.2d at 923. The law does not require that a plaintiff be specifically named in an allegedly defamatory statement, for a statement might be defamatory if, by description or circumstances, it tends to identify the plaintiff as its object. Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985).

Plaintiffs base their defamation claim upon statements referring to 800-number dealers in general as "pirates." Individual group members may sue based upon statements about a group when the statements were directed toward a "comparatively small class or group all of whose constituent members may be readily identified and the recipients of the [statements] are likely to identify some, if not all, of them as intended objects of the defamation." Farrell v. Triangle Publications, Inc., 159 A.2d 734, 736-37 (Pa. 1960). But no claim arises from a defamatory remark directed toward a group whose membership is so numerous that no individual member can reasonably be deemed its intended object. Id. at 736. Similarly, no claim exists if, for any other reason, a reader could not reasonably conclude that the statements at issue referred to the particular person or persons alleging defamation. Id. at 737.

Relying upon record evidence indicating that in 1990 there were only 20 to 25 800-number dealers in the industry (app. at 1123-24), plaintiffs argue that they may base their claim on statements directed at 800-number dealers in general. Cf. Restatement (Second) of Torts § 564A, comment c. As noted above, however, a group's size is not the sole consideration in determining whether individual members may assert defamation claims based upon statements about the group. A group may be relatively small, but statements which disparage it may not serve as a basis for an individual defamation claim unless a reader could reasonably connect them to the complaining individual.

In Farrell, for example, one of 13 township commissioners asserted a defamation claim against a newspaper which had published a story implicating "a number of township commissioners and others" in corrupt activity. Farrell, 159 A.2d at 736. The Pennsylvania Supreme Court held that the plaintiff had stated a claim for defamation. In so holding, however, the court concentrated not on the size of the group discussed but on whether readers "knew that the plaintiff was one of the thirteen commissioners." Id. at 738. We similarly do not end our inquiry upon being apprised that there were between 20 and 25 800-number dealers in 1990; we examine whether the plaintiffs were "sufficiently identified as [objects of NDPA's statements] to justifiably warrant a conclusion that [their] individual reputation[s have] been substantially injured." Id. at 736.

Here, there is nothing in the record other than the number of 800-dealers which could support a conclusion that any

of the plaintiffs' individual reputations were injured by NDPA's statements about 800-number dealers in general.  Indeed, the individual identities of this group's members are, by the very nature of their business, less meaningful than the telephone numbers they promote to facilitate discount purchases.  This group appears amorphous and ill-defined when compared to the well-defined group of township commissioners at issue in Farrell. Plaintiffs have not produced evidence tending to prove that they belong to such an easily identifiable, cohesive group that a reader would ascribe statements referring to 800-number dealers in general as "pirates" to any of them individually.  Thus, we will affirm the district court's grant of summary judgment on Count X.

VIII.

For the foregoing reasons, we will reverse the district court's grant of summary judgment as to Counts I and II, as well as the corresponding portion of Count VI, but will affirm its disposition of Counts III, IV, VII and X and the remainder of Count VI.

ALVORD-POLK, INC., ET AL., v. F. SCHUMACHER & CO., ET AL.
No. 92-1762

STAPLETON, J., concurring in part and dissenting in part:

I would affirm the district court's summary judgment in favor of the defendants on the vertical conspiracy count and, accordingly, dissent from Section V of the court's opinion. I am also unable to join all of Sections IV-A, VII-A, and VII-B. I do join the remainder of the court's opinion. I comment only on the trade association aspect of the horizontal conspiracy charge and on the vertical conspiracy charge.

I.

Trade associations have been held liable for unreasonably restraining trade in violation of section 1 of the Sherman Act, even when they have not been accused of contracting, combining, or conspiring with other unrelated actors. See, e.g., National Soc'y of Professional Eng'rs v. United States, 435 U.S. 679 (1978). Courts, however, have not articulated how a trade association, by itself, can violate a statute which "does not prohibit unreasonable restraints on trade as such -- but only restraints effected by a contract, combination, or conspiracy." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984).

A sound theory of trade association liability under section 1 will recognize the anticompetitive potential inherent

in an agglomeration of competitors.  Indeed, trade associations have fixed prices, see, e.g., Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975), organized group boycotts, see, e.g., Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457 (1941), allocated customers and territories, see, e.g., United States v. Topco Assoc., Inc., 405 U.S. 596 (1972), and suppressed potential competitors, see, e.g., United States v. Women's Sportswear Mfr. Ass'n, 336 U.S. 460 (1949).  A sound theory of trade association liability, however, also will recognize that some trade association activities are not necessarily inconsistent with the preservation of competition.  These activities include cooperative research, market surveys, development of new uses for products, mutual insurance, publication of trade journals, advertising, and joint representation before legislative and administrative agencies.  See Julian O. van Kalinowski, Antitrust Laws and Trade Regulation § 6I.01.  Most trade associations are organized for the purpose of pursuing these kinds of activities and most members initially join because of the benefit to be derived therefrom.  If such an association thereafter engages in anticompetitive activity, only a limited number of its members may be involved in, or even aware of, the change of course. Finally, a sound theory of trade association liability will conform with the "well-established" rule that "[a] single person or entity acting alone is not subject to the strictures of Section 1."  Earl W. Kintner, Federal Antitrust Law § 9.7.

The plaintiffs insist that trade association activity is concerted activity for purposes of section 1.  Since any

activity of an officer of an association engaged in with apparent authority is activity of the association under conventional rules of agency, any such activity, in plaintiffs' view, is thus concerted activity for purposes of section 1. This logic eviscerates the concerted action requirement of section 1.[14]

In my view, the agreement element of a section 1 claim is satisfied if, but only if, it is shown that two or more of the association's members have committed themselves to the anti-competitive activity of the trade association and to the accomplishment of its objectives. Thus, in the absence of a conspiracy between the trade association and a third party, the association can be liable only if some of its members are using it to unreasonably restrain trade.

Since a trade association is normally controlled by its members, where an association has engaged in anticompetitive activity, it normally will not be difficult to show the necessary agreement among a group of its members. The focus of the theory on the commitment of its members to anticompetitive activity, however, has important corollary consequences. One is that members of the trade association who neither participate nor knowingly acquiesce in the association's anticompetitive activity, unlike those who do, will not be held liable along with the association. See, e.g., Kline v. Coldwell, Banker & Co., 508

---

[14]. For the reasons explained in the court's opinion, the agency principles discussed in American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp., 456 U.S. 556 (1982), and the Supreme Court's application of those principles in that case are not pertinent until a violation of section 1 has been established.

F.2d 226 (9th Cir. 1974), cert. denied, 421 U.S. 963 (1975); Phelps Dodge Refining Corp. v. FTC, 139 F.2d 393 (2d Cir. 1943); see generally, Earl W. Kinter, Federal Antitrust Law § 9.16.

Another collateral consequence of this theory of concerted activity is that, in the absence of membership commitment to an activity engaged in by an association officer or a conspiracy between the officer and some other entity, the activity of the officer is not concerted activity. It seems to me that this must be true without regard to whether the officer had apparent authority to act as he did, although evidence supporting the existence of apparent authority may also constitute circumstantial evidence tending to show concerted activity on the part of the members of the association.

As the district court recognized, if NDPA's directors, acting on behalf of the retailers they represent, had passed a resolution instructing its officers to recruit retailers for a boycott of any manufacturer who dealt with 800-number dealers and to threaten manufacturers with such a boycott, and an officer of the association had carried out this directive, the association clearly would have engaged in concerted activity for purposes of section 1. As the district court emphasized, there is no evidence of such formal corporate action in this record.

The district court erred, however, by not continuing its inquiry beyond this level. If NDPA's directors did not pass such a resolution but, acting on behalf of the retailers they represented, tacitly agreed among themselves to so instruct NDPA's officers, the association would just as surely be engaged

in concerted activity when an officer carried out this agreement. In this situation, as in the first, NDPA would have been used by its members, through their representatives on the board, to engage in concerted activity.  The same would be true if an officer of the NDPA had initiated this kind of anti-competitive activity without the knowledge or approval of the board and the board, after learning of it, had approved or acquiesced in it. As a matter of antitrust theory, however, I do not think that an activity of an NDPA officer, even if engaged in with apparent authority, can constitute concerted activity in the absence of some basis for inferring member commitment to that activity.

With this theoretical background, I turn to the summary judgment record in this case.  Plaintiffs urge that a trier of fact could infer from the present record that officers of NDPA, with the approval of NDPA's board and the retailers they represent, threatened FSC and other manufacturers with a dealer boycott if they did not take measures against the 800-number dealers.  I do not understand the defendants to urge at this stage that such an inference would not provide a satisfactory basis for imposing section 1 liability.[15]  They do insist, however, that such an inference cannot reasonably be drawn from the current record.  While the issue is a close one, I think there is enough evidence to make the plaintiffs' inference a permissible one.

---

[15].  I express no opinion on whether the activities the defendants are accused of engaging in constitute an unreasonable restraint of trade within the meaning of section 1 of the Sherman Act.

Mr. Petit, the CEO of NDPA, candidly acknowledged speaking directly to numerous manufacturers after the consent decree about the concerns of conventional retailers regarding 800-number dealers.  Given the past history of the matter and Mr. Petit's view that the scope of FTC's consent decree was of very limited effect, a rational trier of fact could infer that Mr. Petit continued, after the decree, not only to express to manufacturers the concerns of the conventional dealers, but also to call upon them to take specific steps to thwart the 800-number dealers.  When he spoke to manufacturers about this matter, he spoke on behalf of the NDPA.  As he testified, he spoke about "the concerns of the NDPA."  App. 191.  Clearly, he viewed himself as authorized by the NDPA to say what he did.  As he put it, "That's my job," referring to his campaign among the manufacturers.  App. 192.

As the defendants stress, there is no direct evidence of a threat of a boycott by Mr. Petit or anyone else on NDPA's behalf.  There is, however, evidence that Mr. Petit emphasized to the manufacturers "the anger felt by the retailers in [the] lack of support from the wallcovering industry,"  App. 185, and that his demands for action by the manufacturers came against a background of public, oral and written advice from NDPA officers that conventional retailers should deal only with those manufacturers who supported them.  When one adds to this evidence the fact that some manufacturers did respond with measures against the 800-number dealers, I believe a trier of fact could

conclude that a boycott threat was intended by the NDPA officers and understood by the manufacturers.

Finally, if a trier of fact inferred that NDPA officers implicitly threatened a boycott, it would be permissible for the trier of fact to further infer that the NDPA board members knew of the boycott threat and at least tacitly approved it. Mr. Petit's triumphant memorandum of January 29, 1990, to the board members is strong circumstantial evidence supporting this view. That memorandum, it will be recalled, declared that FSC's decision not to sell to the "sales pirates" was "a major step forward in our battle against the 800-number operators." App. 693 (emphasis added). There is, in addition, evidence that the board regularly discussed this matter and it was receiving intense pressure from NDPA membership to do something about the problem. Thus, like my colleagues, I would reverse the district court's summary judgment in favor of the defendants on the horizontal conspiracy charge.

II.

Turning to the charged vertical conspiracy, I start with the undisputed propositions that (1) potential purchasers of wallcovering normally desire to view samples of the merchandise before making a purchase, (2) as a result, FSC has for years sold sample books and promotional materials and has for years encouraged other investment from its retailers to facilitate customer selection and satisfaction, and (3) the 800-number retailers are free riders as far as that investment is concerned.

Since FSC cannot long remain successfully in business if its retailers are unwilling to make the investment necessary to facilitate customer selection and satisfaction, FSC has a legitimate and compelling interest in making sure free riders do not maintain a competitive advantage over retailers who are willing to make that investment. Nothing in this record tends to show that FSC took any action with respect to the plaintiffs other than to serve this interest. In particular, there is no evidence from which a finder of fact could infer a retail price maintenance conspiracy involving FSC. Under the now-familiar teachings of Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984), the mere fact that FSC's conventional retailers complained and FSC acted in response to those complaints does not preclude summary judgment for the defendants.

In Monsanto, a manufacturer and some of its distributors allegedly conspired to sanction a discount distributor. The Supreme Court began its analysis by noting that section 1 outlaws only some sanctions against a discount distributor: unilateral conduct is not forbidden and concerted action is per se illegal only when it fixes prices. Id. at 760-61. The Supreme Court then observed that these distinctions are often difficult to apply in practice because the economic effect of legal and illegal conduct can be similar -- indeed, "judged from a distance, the conduct of the parties in the various situations can be indistinguishable." Id. at 762. Care, the Supreme Court directed, should be taken in inferring a conspiracy from highly ambiguous evidence, lest perfectly legitimate conduct

is deterred or penalized.  Id. at 763.  The Supreme Court went on
to hold that a vertical conspiracy cannot be inferred solely from
evidence of complaints from distributors to a manufacturer about
a discount distributor and a resulting termination of the
discount distributor:

> Permitting an agreement to be inferred merely
> from the existence of complaints, or even
> from the fact that termination came about "in
> response to" complaints, could deter or
> penalize perfectly legitimate conduct. . . .
> Moreover, distributors are an important
> source of information for manufacturers.  In
> order to assure an efficient distribution
> system, manufacturers and distributors
> constantly must coordinate their activities
> to assure that their product will reach the
> consumer persuasively and efficiently.  To
> bar a manufacturer from acting solely because
> the information upon which it acts originated
> as a price complaint would create an
> irrational dislocation in the market. . . .
>
> Thus, something more than evidence of
> complaints is needed.  There must be evidence
> that tends to exclude the possibility that
> the manufacturer and nonterminated
> distributors were acting independently.  As
> Judge Aldisert has written, the antitrust
> plaintiff should present direct or
> circumstantial evidence that reasonably tends
> to prove that the manufacturer and others
> "had a conscious commitment to a common
> scheme designed to achieve an unlawful
> objective."

Id. at 764.

The three pieces of evidence that the plaintiffs in
this case have offered to prove a vertical conspiracy fail to
meet the standard that the Supreme Court set forth in Monsanto.
First, the plaintiffs note that the conventional retailers

complained to FSC about the 800-number dealers.  Complaints like these are precisely what the Supreme Court considered in Monsanto and found to be insufficient to prove a vertical conspiracy:

> [C]omplaints about price cutters "are natural -- and from the manufacturer's perspective, unavoidable -- reactions by distributors to their rivals."  Such complaints, particularly where the manufacturer has imposed a costly set of nonprice restrictions, "arise in the normal course of business and do not indicate illegal concerted action."

Id. at 763 (citations omitted).

Second, plaintiffs offer evidence that FSC did not use mathematical calculations from its own cost data to set the drop-shipment surcharge, even though the surcharge was purportedly instituted to equalize the costs of deliveries to the conventional and 800-number retailers.  The absence of mathematical calculation supposedly suggests a vertical conspiracy:  in the words of this court, "FSC may have imposed the surcharge without first undertaking mathematical calculations because it had agreed with others to impose the surcharge whether it made economic sense or not."

FSC's determination of the drop-shipment surcharge is not probative of whether FSC acted alone or in conspiracy with the conventional retailers.  An arbitrarily chosen surcharge is equally compatible with both unilateral and concerted conduct.  Seeking to end destructive free-riding, FSC might have exercised its right under United States v. Colgate, 250 U.S. 300 (1919), to unilaterally limit its dealings with 800-number retailers and, toward that end, imposed a substantial surcharge to level the

playing field for conventional retailers, or even to cripple the 800-number retailers.  While I acknowledge that FSC and the conventional retailers conceivably could have conspired to cripple the 800-number retailers through a substantial surcharge, that concession does not preclude summary judgment for the defendants.  Because a surcharge fixed by FSC is equally compatible with both hypotheses, no inference of conspiracy can be drawn:  "Monsanto . . . establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 597 n.21 (1986).

Plaintiffs' third piece of evidence of a vertical conspiracy is the differently-phrased explanations FSC offered in internal and external communications for the drop-shipment surcharge.  This court observes that "a jury might view FSC's apparent desire to use more genteel language when explaining its actions to the public as implying a sinister motive."

FSC's liability under section 1, however, does not turn on whether FSC had "a sinister motive," but whether it acted alone or in combination with the conventional retailers.  The varying tones in internal and external communications are consistent with both hypotheses -- the sanitized language that FSC used to avoid drawing attention to its moves against the 800-number dealers could have been the result of either a unilateral decision to eliminate free-riding or a conspiracy with the conventional dealers against the 800-number retailers.  Once more

plaintiffs have presented "highly ambiguous evidence," Monsanto, 465 U.S. at 763, that does not tend "to exclude the possibility that the manufacturer and nonterminated distributors were acting independently," id. at 764.

A misreading of Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358 (3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993), may well be responsible for the court's decision on the vertical conspiracy count. In Big Apple BMW, we noted that a manufacturer's "inconsistent reasons" for denying a franchise support an inference of conspiracy with existing franchisees. Id. at 1374. The court seizes on this language from Big Apple BMW to argue that FSC's drop-shipment surcharge and the varying tones of internal and external communication about the surcharge are inconsistencies which permit an inference of conspiracy. This analogy is flawed.

In Big Apple BMW, unsuccessful applicants for an automobile dealership brought a claim under section 1, charging that the manufacturer and existing dealers conspired to deny them the dealership because they would have been price cutters. The plaintiffs identified actions of the defendants which suggested a conspiracy, but the defendants tendered business reasons for each of their actions. We found that summary judgment was inappropriate: even though the defendants had offered justifications for their actions, these justifications were "internally inconsistent and inconsistent with [the manufacturer's] concomitant treatment of [other] dealers." Id. at 1374. For example, the manufacturer claimed that it refused

to award a franchise to the applicants because they attempted to bribe one of its employees; evidence showed that the same employee solicited the applicants to buy a franchise only a year after the attempted bribe.  Id. at 1368.  The manufacturer claimed that it refused to award a franchise to the applicants because they would have engaged in price advertising; evidence showed that other dealers engaged in price advertising.  Id. at 1378.  The manufacturer claimed that it refused to award a franchise to the applicants because they would have located their dealership in an "automall" adjacent to other manufacturers' dealerships; evidence showed that the manufacturer tolerated other multi-franchise dealerships.  Id. at 1380.

In Big Apple BMW, if the trier of fact believed the plaintiffs' evidence that tended to show pretext, it would be left with no reason to believe that the manufacturer acted unilaterally to advance its own self interest.  This case is fundamentally different.  A trier of fact in this case could believe that FSC did not calculate the drop charge from its cost data and could agree with every inference plaintiffs seek to draw from the draft press release and this would still not alter the indisputable fact that FSC had a legitimate and compelling self interest in solving the free rider problem and preserving an effective distribution system.

Finding no evidence in the record that tends to exclude the possibility that FSC acted unilaterally against the 800-number dealers, I would affirm the district court's grant of summary judgment on the vertical conspiracy count.