# Supreme Court of Texas

No. 20-0014

AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc.,

*Petitioners*,

v.

iPic-Gold Class Entertainment, LLC and iPic Texas, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued September 16, 2021**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

Justice Young did not participate in the decision.

Respondents allege that petitioners conspired to restrain trade in the movie-theater market in violation of Section 15.05(a) of the Texas Free Enterprise and Antitrust Act ("Texas Antitrust Act").[1] The Act provides that it "shall be construed in harmony with federal judicial

---

[1] TEX. BUS. & COM. CODE §§ 15.01-15.22.

interpretations of comparable federal antitrust statutes".[2] "Section 15.05(a) is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act".[3] The United States Supreme Court has held that "[t]o survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."[4] The parties agree that this requirement governs in cases brought under the Texas Act; they disagree on its application in this case. The court of appeals held that respondents satisfied this requirement and reversed the trial court's summary judgment for petitioners.[5] We disagree and thus reverse and render judgment for petitioners.

## I

## A

AMC[6] and its competitor Regal[7] own the two largest movie-

---

[2] *Id.* § 15.04.

[3] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990); *see* 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.").

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (citing *Matsushita*).

[5] 592 S.W.3d 946, 958 (Tex. App.—Houston [1st Dist.] 2019).

[6] By "AMC" we refer to petitioners AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc.

[7] By "Regal" we refer to Regal Entertainment Group.

theater chains in North America, with hundreds of theaters each.[8] Both chains specialize in megaplexes—large theaters with 20 or more screens and traditional amenities such as popcorn, soft drinks, and candy.

iPic[9] owns a chain of boutique theaters in the United States. iPic's theaters—there were 13 at the time of the trial court proceedings, and around 15 today—offer an upscale experience with reclining seats situated in pods, full-service waitstaff, chef-prepared meals, and specialty cocktails. A "premium plus" ticket at an iPic theater costs more than twice the typical ticket at an AMC or Regal megaplex.

iPic alleges that starting in early 2013, AMC and Regal conspired to eliminate iPic from the markets in Houston and Frisco, just north of Dallas, by "clearing" a proposed iPic theater near Regal Greenway in central Houston and another near AMC Stonebriar in Frisco. iPic's allegations require an understanding of the film industry.

AMC, Regal, and iPic are movie *exhibitors*. Historically, exhibitors licensed movies from third-party *distributors*, which acted as liaisons between exhibitors and the production studios. Today, the six largest production studios—Walt Disney Studios, Warner Brothers Entertainment, 20th Century Fox, Paramount Pictures, Sony Pictures, and Universal Studios—act as their own distributors. But there remain independent distributors too, such as Lionsgate, Focus, the Weinstein Company, Bleeker Street, Broad Green, and Open Road Films.

---

[8] AMC and Regal are two-thirds of the "Big Three" U.S. movie-theater chains, the third being Cinemark.

[9] By "iPic" we refer to respondents iPic-Gold Class Entertainment, LLC and iPic Texas, LLC.

Open Road is an independent distributor formed in 2011 as a joint venture between AMC and Regal. Open Road has since been sold, but at all times relevant to this lawsuit, it was owned by AMC and Regal, and executives of both companies sat on its board.

When theaters in close proximity show the same first-run (new release) film, they are playing the film *day-and-date*. To prevent playing day-and-date with a competitor, a theater can request that a film's distributor grant it a *clearance*—an exclusive license to show the film for a period of time. Clearance practices are traceable to the earliest days of the film industry. Because theaters had only a handful of screens, they could not play every first-run film available. Theaters nearby one another thus bid against each other to secure the exclusive license to play a particular film. In exchange for that exclusive license, a theater would pay the distributor a guaranteed sum and take responsibility for advertising and promoting the film in the area.

The parties disagree about what role clearances have played in the industry in more recent history. At a pretrial hearing in the trial court, iPic presented witness testimony that clearances began phasing out in the 1980s when distributors moved to an allocation system. Later, when megaplexes began sprouting up in the mid-1990s, allocating films was no longer necessary because a megaplex can play every first-run movie available.

Regal is no longer a party to this case, but its historical clearance practices are central to iPic's conspiracy allegations against AMC. Regal CEO Amy Miles testified that when she joined the company in 1999, Regal already had a general policy of seeking clearances against

theaters in proximity to a Regal theater. Miles explained that Regal recognizes 70 clearance zones across the country in which Regal seeks clearances against any class of theater within three miles, and distributors therefore allocate first-run films between Regal and the theater nearby. In Houston, for example, Regal Greenway sought clearances against the River Oaks Theatre beginning in 1999 when the Greenway opened.[10]

In 17 of Regal's clearance zones, Regal clears a theater owned by AMC. In 15, one Regal theater clears another Regal theater. One example is a clearance zone in northern Virginia, where a 20-screen Regal theater clears one of Regal's smaller theaters that offers luxury amenities similar to those offered by iPic. Another example occurs in northwest Austin, where Regal's Gateway 16 does not play day-and-date with its Arbor 8 theater.

Miles testified that Regal believes clearances are beneficial to the entire film-industry ecosystem, including theaters and customers, because clearances ultimately facilitate more films being shown in a geographic area and for longer. Miles projected that without clearance zones, theaters would devote most of their screens to blockbusters, which would play through the theaters faster, resulting in less choice for consumers and less revenue for distributors and theaters.

Miles acknowledged, however, that Regal has made some exceptions to its three-mile policy over the years. Regal usually does not

---

[10] The historic River Oaks Theatre opened in Houston's River Oaks District in 1939 and closed permanently in March 2021. The theater was a Houston landmark known for playing *The Rocky Horror Picture Show* on Saturdays.

seek clearances in densely populated areas such as Manhattan, where a three-driving-miles rule of thumb does not make sense. Regal's clearance practices have also varied when it has acquired an existing theater. "[I]f we acquire a theater that didn't assert a clearance prior to the acquisition, we don't go back and try to change that, post-acquisition", Miles explained.

In 2008, Regal declined to clear a dine-in theater within its Redmond, Washington clearance zone that later became an iPic. In 2010, Regal declined to clear the iPic Austin, which opened less than three miles from Regal's Gateway 16 and Arbor 8 theaters. Miles testified that these exceptions to Regal's three-mile policy were tests conducted at the request of distributors to determine whether luxury theaters—then a new and innovative concept—would truly compete with traditional ones. There is conflicting evidence on what the data from the Redmond and Austin tests show, but Miles testified that once luxury theaters took off, Regal came around to viewing them as competitors to Regal's more traditional theaters.

**B**

Before 2012, AMC had never requested clearances against competing theaters. But that year it adopted its own corporate policy of requesting clearances against theaters within roughly three miles of an AMC theater. An internal report prepared by AMC in November 2012 reflects AMC's determination that asserting clearances could help fend off "competitive encroachment".

In December 2012, AMC made a presentation on the new policy to various studios and to Open Road personnel. Written materials from

that presentation project that without a change in clearance policy, new competition would negatively affect AMC's revenue. The materials reflect that AMC had considered the matter "carefully" and would "stand behind" the decision to start asserting clearances "for the long-term health of [its] . . . business".

In January 2013, Regal's president and COO, Greg Dunn, who also sat on the board of Open Road, directed Regal's head film buyer, Ted Cooper, to clear all luxury or dine-in theaters within three miles of a Regal theater. Around the same time, Regal learned that iPic planned to build a theater in Houston within three miles of Regal Greenway. In April 2013, Regal's Ted Cooper told iPic executive Clark Woods at an industry conference that Regal planned to clear iPic's new Houston theater. A few days later, iPic's CEO, Hamid Hashemi, emailed a colleague that "Regal . . . just told us they are clearing us in Houston", characterizing Regal's decision as "[n]o biggie". Also in April 2013, iPic opened a new theater in Los Angeles within three miles of an AMC theater. Despite its new policy, AMC declined to clear iPic Los Angeles, and the two theaters play day-and-date. It was not until several months later, around December 2013, that iPic began making plans for a Frisco theater.

In April 2014, AMC learned that iPic was in the process of negotiating a lease for a space in Frisco located within three miles of AMC Stonebriar. An internal AMC email characterized the forthcoming iPic as "[a]n obvious clearance situation" and expressed AMC's intention to "move quickly" to communicate its clearance request to distributors. An internal email between AMC personnel dated May 16, 2014,

contained this draft clearance request to distributors for the anticipated iPic Frisco:

Dear XXXXXXXXX,

iPic, a movie exhibition company, is planning a new theatre at Forum at Wade Park located at the corner of Lebanon Rd and Parkwood Blvd in Frisco, TX. This new development is 1.75 direct miles and 2.2 driving miles north of our AMC Stonebriar theatre, with no geographic barriers. This theatre, if it were to play first-run movies, would be in substantial competition with AMC Stonebriar 24. In the last twelve months, AMC Stonebriar 24 has grossed $X [amount redacted] and has more than enough capacity to fully serve movie-going demand in this zone that has a 3-mile population of 82,651 people.

Accordingly, AMC will not license [Distributor's] films to be played day-and-date with this proposed new theatre, but instead requests that each film be licensed pursuant to clearances in this particular film licensing zone. Clearances in this zone would clearly be deemed reasonable under the well-established jurisprudence governing the legality of clearances.

We have enjoyed a productive business relationship with [Distributor name] at the Stonebriar 24 since AMC opened this location on 8/4/00. We look forward to continuing that ongoing relationship in this zone.

The letters were not sent out immediately. AMC executive Bob Lenihan testified by deposition that the lack of urgency in sending the requests—construction on iPic Frisco had not even begun—and AMC's being "a big company with a lot of bureaucracy" were the likely reasons for the delay. Another AMC executive, Nathan Reid, testified by deposition that AMC's film department received final approval to send

out the requests in late June and that a two-month delay from drafting to sending a clearance request was "[n]ot at all" unusual.

On June 20, AMC's head film buyer, Ryan Wood, forwarded the draft clearance letter to colleagues with a note that the "[p]lan will be to send on Tuesday (7/1)". Still, the letters were not sent out on the 1st. iPic points to calendar entries in the record indicating that on July 2, Lenihan had lunch with Open Road personnel and that an AMC executive had a phone call scheduled with a Regal executive about Open Road matters. There is no evidence that clearances against iPic were discussed at the meeting or on the call.

Ryan Wood testified by deposition that distribution of the letters was delayed by the holiday weekend. "[P]hone calls needed to be made to each of the contacts [AMC was] sending [the letters] to", and it was too "close to July 4th weekend where [AMC and] a lot of the [distributors] were [going to be] closed for certain days". Woods explained that it was AMC's practice not to send a clearance letter until AMC had reached the recipient by telephone first; that with respect to certain distributors, AMC needed to make calls to multiple people; and that this process required "a phone conversation", "not just a voicemail left".

AMC finally started sending out its clearance requests on July 8. That same day, Regal began calling distributors to communicate that it wanted to clear iPic Houston. In these phone calls, Regal communicated to several distributors that it would refuse to play any movie at its Greenway theater that the distributor also offered to iPic Houston. AMC's clearance letters communicated the same message with respect

9

to iPic Frisco.

No distributor bit on AMC's requests to clear iPic Frisco. Each either denied the request outright or refused to address it until iPic solidified its plans for a Frisco theater. In January 2017, AMC emailed all the distributors that it had sent clearance requests to for iPic Frisco and formally withdrew those requests. iPic Frisco was never built for reasons unrelated to this lawsuit, and iPic has not claimed any damages related to that proposed theater.

In response to Regal's requests, three distributor-studios—Sony, Universal, and Fox—decided to allocate their films between Regal Greenway and iPic Houston. The rest denied or ignored Regal's request.

## C

iPic filed this suit against Regal and AMC in November 2015, just a few weeks after iPic Houston opened. iPic initially alleged several antitrust claims under Section 15.05 of the Texas Antitrust Act as well as a common-law claim for tortious interference with iPic's business.

In January 2016, the trial court temporarily enjoined Regal from making further clearance requests against iPic Houston or communicating to distributors that it would not play day-and-date with iPic Houston. After that order was affirmed on appeal,[11] Regal settled, leaving AMC as the only defendant. iPic alleges damages in the form of lost revenue and goodwill during the first few months that iPic Houston was open, before the trial court's temporary injunction order.

AMC filed a traditional and no-evidence motion for summary

---

[11] *Regal Ent. Grp. v. iPic-Gold Class Ent., LLC*, 507 S.W.3d 337 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

judgment on all claims against it. The trial court granted the motion without stating its reasons and rendered judgment dismissing all iPic's claims. iPic appealed the court's judgment with respect to one claim alleging a horizontal conspiracy between Regal and AMC to restrain trade under Section 15.05(a). The court of appeals reversed the summary judgment and remanded the case for trial.[12] We granted AMC's petition for review.

## II

The Texas Antitrust Act's stated "purpose . . . is to maintain and promote economic competition in trade and commerce" in the state and "to provide the benefits of that competition to consumers".[13] "[T]o the extent consistent with [that] purpose", the Act's provisions should "be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes".[14]

iPic's sole remaining claim alleges a horizontal conspiracy between Regal and AMC under Section 15.05(a) of the Act to "crush iPic with clearances" in order to put iPic out of business in Houston and Frisco. Even though all iPic's damages were sustained by iPic Houston, and AMC only tried to clear the rumored-but-never-built iPic Frisco, iPic argues that under antitrust law, AMC is liable as Regal's co-conspirator for damages to iPic Houston.

Section 15.05(a) states that "[e]very contract, combination, or

---

[12] 592 S.W.3d 946 (Tex. App.—Houston [1st Dist.] 2019).

[13] TEX. BUS. & COM. CODE § 15.04.

[14] *Id.*

11

conspiracy in restraint of trade or commerce is unlawful."[15] Section 15.21 authorizes "[a]ny person . . . whose business or property has been injured" by a violation of Section 15.05 to sue for damages and injunctive relief.[16] These provisions are "comparable to, and indeed taken from," Sections 1 and 15 of the Sherman Antitrust Act, respectively.[17] Because "our own caselaw [on the Texas Antitrust Act] is limited," we must "rely heavily on the jurisprudence of the federal courts" in Sherman Act cases to resolve the issues presented here.[18]

Like the language of its federal counterpart, the broad language of Section 15.05(a) indicates that *every* conspiracy in restraint of trade is unlawful. Yet the United States Supreme Court has, since its earliest decisions, "recognized that [Section 1] was intended to prohibit only unreasonable restraints of trade."[19] Some kinds of conspiratorial agreements—a horizontal agreement to fix prices, for example—are considered per se illegal.[20] Most, however, are evaluated on a case-by-

---

[15] *Id.* § 15.05(a).

[16] *Id.* § 15.21(a)-(b).

[17] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990); *see* 15 U.S.C. §§ 1, 15.

[18] *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 (Tex. 2015) (quoting *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688-689 (Tex. 2006)).

[19] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 94 (1984)).

[20] *Id.*; *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) ("An agreement between competitors to fix prices, known as a horizontal price-fixing agreement, categorically constitutes an unreasonable

case basis under the "rule of reason," which requires the court to determine whether a restraint is unreasonable by "examining a defendant's purpose in implementing the restraint and the restraint's effect on competition" as well as all factors relevant to that examination.[21]

The seminal antitrust case on movie-theater clearances is *United States v. Paramount Pictures*.[22] There, the Supreme Court did not reach the issue of whether clearances are unlawful per se under the Sherman Act because the Department of Justice had not appealed the district court's ruling that they are not.[23] But the Supreme Court noted the district court's conclusion that a clearance asserted to protect a theater's revenue interest in a film is likely reasonable if the clearance does "not unduly extend[] as to area or duration",[24] and the theaters affected are in "substantial competition" with one another.[25]

AMC and iPic vigorously dispute whether iPic is in substantial competition with megaplexes like AMC and Regal. But we need not make that determination because iPic did not raise the issue in its

---

restraint, and, accordingly, is unlawful *per se*." (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006))).

[21] *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996) (citing *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918)).

[22] 334 U.S. 131 (1948).

[23] *Id.* at 145.

[24] *Id.*

[25] *Id.* at 146.

motion for summary judgment.[26] AMC's motion instead focused on the remaining elements of iPic's claim: (1) whether AMC and Regal made an agreement to "crush iPic with clearances"; and (2) if they did,

---

[26] We express no opinion whether the Supreme Court's statements about substantial competition in *Paramount Pictures* survive the Court's subsequent decisions clarifying the scope of the Sherman Act and defining the relevant market for antitrust purposes. *Compare Regal Ent. Grp. v. iPic-Gold Class Ent., LLC*, 507 S.W.3d 337, 348 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("Whether theaters are in substantial competition turns on whether they sell a reasonably interchangeable product in the same geographic area."), *with United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected." (footnote and quotation marks omitted)), and *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The boundaries of [a well-defined submarket within a broader product market] may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

We note, however, that—outside of an inquiry into whether a proposed merger's effect "may be substantially to lessen competition" under the Clayton Act, 15 U.S.C. § 18—the words "substantial competition" have not appeared in an antitrust decision from the Supreme Court since *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537 (1954), a decision that also predates the Court's seminal opinions in *Du Pont* and *Brown Shoe. Cf. FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) ("In *California Dental*, we held (unanimously) that abandonment of the 'rule of reason' in favor of presumptive rules (or a 'quick-look' approach) is appropriate only where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999))); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[W]e decline to resolve this case by forcing the Federation's policy into the 'boycott' pigeonhole and invoking the *per se* rule.").

whether that agreement caused injury to iPic Houston.[27] We need only address the first issue.

## III

iPic alleges a conspiratorial agreement between AMC and Regal to "crush iPic with clearances"—i.e., to put iPic out of business in Houston and Frisco by preventing it from obtaining first-run films in those markets. Because this appeal arises from a summary judgment for AMC, we review the lower courts' judgments de novo, taking as true all evidence favorable to iPic and indulging every permissible inference in its favor.[28] But because federal antitrust law guides our construction of the Texas Antitrust Act, our examination of the evidence must also take into account federal caselaw limiting what inferences are reasonable when the plaintiff's evidence is ambiguous and the alleged conspiracy is not plausible.[29] We begin with an overview of the different types of antitrust claims available under Texas and federal law and the elements

---

[27] *See* TEX. BUS. & COM. CODE § 15.21 (authorizing any person "whose business or property has been injured by reason of any conduct declared unlawful" under Section 15.05 to sue for damages or injunctive relief); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986) ("To survive petitioners' motion for summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury." (footnote and citation omitted) (citing FED. R. CIV. P. 56(e))).

[28] *See BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 195-196 (Tex. 2021).

[29] *See Matsushita*, 475 U.S. at 588 ("[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) ("*Matsushita*, then, stands for the proposition that substantive 'antitrust law limits the range of permissible inferences' that may be drawn from ambiguous evidence." (quoting *Matsushita*, 475 U.S. at 588)).

15

required to establish the claim alleged here.

## A

For anticompetitive conduct to give rise to liability under Section 1 of the Sherman Act or Section 15.05(a) of the Texas Antitrust Act, the conduct must "stem[] . . . from an agreement, tacit or express", rather than from independent action.[30] Because antitrust law "does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms".[31] Thus, antitrust law generally distinguishes between unilateral and multilateral conduct, treating multilateral conduct as the more dangerous and more likely to warrant judicial intervention.[32] In the federal context, challenges to multilateral conduct

---

[30] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters.*, 346 U.S. at 540); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed [under the Sherman Act]. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.").

[31] *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984).

[32] *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("The meaning of the term 'contract, combination . . . , or conspiracy' is informed by the 'basic distinction' in the Sherman Act 'between concerted and independent action' that distinguishes § 1 of the Sherman Act from § 2." (quoting *Copperweld Corp.*, 467 U.S. at 767)); *cf. Copperweld Corp.*, 467 U.S. at 767-768 ("In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.").

are brought under Section 1 of the Sherman Act (the federal analogue to Section 15.05(a) of the Texas Antitrust Act), and challenges to unilateral conduct are brought under Section 2 of the Sherman Act (the federal analogue to Section 15.05(b)).[33]

Because a Section 1 claim challenges multilateral conduct, its "very essence . . . is the existence of an agreement."[34] Indeed, the relevant danger or "activity that warrants § 1 scrutiny" is the "sudden joining of two independent sources of economic power previously pursuing separate interests".[35]

After a plaintiff "establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the

---

[33] *Cf. Am. Needle*, 560 U.S. at 190 ("Section 1 applies only to concerted action that restrains trade. Section 2, by contrast, covers both concerted and independent action, but only if that action 'monopolize[s][]' or 'threatens actual monopolization,' a category that is narrower than restraint of trade." (citations omitted)).

[34] *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994); *see also Monsanto*, 465 U.S. at 761 ("Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Theatre Enters.*, 346 U.S. at 540 ("The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express."); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015) ("An important corollary to the agreement requirement is that § 1 liability cannot be predicated on a defendant's unilateral actions, no matter its anticompetitive motivations."); *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) ("[A] plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities.").

[35] *Copperweld Corp.*, 467 U.S. at 771.

rule of reason."[36] However, "[t]he question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."[37]

"A § 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"[38] "Such proof may come in the form of direct evidence, e.g., an explicit admission from a participant that an antitrust conspiracy existed, or circumstantial evidence."[39] Whether a factfinder can properly infer the existence of an agreement or conspiracy from ambiguous or circumstantial evidence will "vary with the plausibility of the plaintiffs' theory and the dangers associated with

---

[36] *Cap. Imaging Assocs.*, 996 F.2d at 542. With rare exceptions, courts use a three-step, burden-shifting framework to evaluate Section 1 claims under the rule of reason. *See, e.g.*, *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) ("Establishing a violation of the rule of reason involves three steps.").

First, the plaintiff "bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Id.* (quoting *Cap. Imaging Assocs.*, 996 F.2d at 543). Second, "[i]f the plaintiff succeeds, the burden shifts to the defendant to establish the pro-competitive redeeming virtues of the action." *Id.* (internal quotation marks omitted) (quoting *Cap. Imaging Assocs.*, 996 F.2d at 543). Third, "[s]hould the defendant carry this burden, the plaintiff must then show that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition." *Id.* (citing *Cap. Imaging Assocs.*, 996 F.2d at 543).

[37] *Am. Needle*, 560 U.S. at 186.

[38] *Copperweld Corp.*, 467 U.S. at 771 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).

[39] *Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 396 (citing *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)).

such inferences."[40]

B

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, the Supreme Court warned that "courts should not permit factfinders to infer conspiracies when such inferences are implausible[] because the effect of such practices is often to deter procompetitive conduct."[41] The Court explained that "if the factual context [of the alleged conspiracy] renders [the plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[the plaintiff] must come forward with more persuasive evidence to [survive a motion for summary judgment] than would otherwise be necessary."[42] A corollary to this rule is that "conduct [that is just] as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."[43]

*Matsushita* involved an allegation by American TV manufacturers that a group of Japanese manufacturers had conspired over a 20-year period to drive the American firms from the market by fixing artificially high prices in Japan and artificially low prices in the U.S. The American firms' theory was that once their businesses

---

[40] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993)).

[41] 475 U.S. 574, 593 (1986) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762-764 (1984)).

[42] *Id.* at 587; *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002) ("More evidence is required the less plausible the charge of collusive conduct.").

[43] *Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at 764).

collapsed, the Japanese firms would raise prices in the U.S. to recoup their losses from the artificially low prices they had imposed previously. The plaintiffs' evidence consisted largely of the prices themselves. The district court concluded that evidence did not raise a fact issue on the existence of a conspiracy and granted summary judgment for the defendants. The court of appeals reversed.

The Supreme Court pointed to several reasons why the plaintiffs' conspiracy theory was implausible. One was that if the conspiracy did exist, it was a failure. Twenty years after the conspiracy was alleged to have commenced, two American firms, including lead plaintiff Zenith, retained the largest shares of the American market. The Court noted that "[t]he alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy [did] not in fact exist."[44] A conspiracy among the defendant firms would also be "incalculably more difficult to execute than an analogous plan undertaken by a single predator."[45] "[S]uccess [would be] speculative and depend[] on a willingness to endure losses for an indefinite period".[46] Moreover, "each conspirator [would have] a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeed[ed]."[47] Thus, the Court explained, the defendants "had no motive to enter into

---

[44] *Id.* at 592.

[45] *Id.* at 590.

[46] *Id.*

[47] *Id.*

the alleged conspiracy."[48] "[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists", the Court said.[49]

The Court reversed the court of appeals' judgment and remanded for that court to reconsider the evidence in light of the standards announced.[50] The Court directed the court of appeals to determine whether there was any evidence that was "sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so."[51] Evidence offered to defeat summary judgment "must 'ten[d] to exclude the possibility' that [the defendants] underpriced [the plaintiffs] to compete for business rather than to implement an economically senseless conspiracy", the Court said.[52] Absent evidence meeting that strict standard, the Court explained, "there [was] no 'genuine issue for trial'" under Federal Rule of Civil Procedure 56(e), and the Japanese firms were entitled to summary judgment.[53]

The Supreme Court extended the plausibility requirement to the pleading stage in *Bell Atlantic Corp. v. Twombly*, where it held that in order to survive a motion to dismiss under Federal Rule of Civil

---

[48] *Id.* at 595.

[49] *Id.* at 596 (quoting FED. R. CIV. P. 56(e)).

[50] *Id.* at 597-598.

[51] *Id.* at 597.

[52] *Id.* at 597-598 (first alteration in original) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

[53] *Id.* at 598.

Procedure 12(b)(6), a plaintiff's conspiracy allegations must be "plausible on [their] face."[54] In that case, the Court held that the plaintiffs' factual allegations "[came] up short"[55] and failed to "nudge[] their claims across the line from conceivable to plausible"[56] because the allegations rested "on descriptions of parallel conduct and not on any independent allegation of actual agreement among the [defendants]."[57] The Court reiterated that parallel business conduct, even if consciously undertaken, is ambiguous: it is just as consistent with conspiracy as with competitive actions "unilaterally prompted by common perceptions of the market."[58] "[A]t the summary judgment stage", the Court reminded, evidence of ambiguous conduct is not enough; rather, "a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently".[59]

## C

*Matsushita* and *Twombly* teach that (1) parallel business conduct, alone, is insufficient to raise a fact issue on the existence of a conspiracy;[60] (2) when the conspiracy alleged is implausible, more

---

[54] 550 U.S. 544, 570 (2007).

[55] *Id.* at 564.

[56] *Id.* at 570.

[57] *Id.* at 564.

[58] *Id.* at 554.

[59] *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

[60] *Id.* at 556-557 ("Without more, parallel conduct does not suggest conspiracy . . . .").

persuasive evidence will be required to survive summary judgment;[61] and (3) the plaintiff's evidence must tend to exclude the possibility that the defendants acted independently.[62]

Lower federal courts have fleshed out these principles by requiring plaintiffs who base their claim on consciously parallel business behavior to demonstrate the existence of "plus factors".[63] These "factors serve as proxies for direct evidence of an agreement" by "ensur[ing] that courts punish 'concerted action'—an actual agreement—instead of the 'unilateral, independent conduct of competitors.'"[64] There is no definitive list of plus factors,[65] but one district court has listed these eight:

> (1) actions that would be against the defendants' self-interest if the defendants were acting independently, but

---

[61] *Matsushita*, 475 U.S. at 587 ("[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.").

[62] *Twombly*, 550 U.S. at 554 ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently . . . ."); *Matsushita*, 475 U.S. at 588 ("To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984))).

[63] *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

[64] *Id.* (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).

[65] *See id.* ("The question then becomes, what are 'plus factors' that suffice to defeat summary judgment? There is no finite set of such criteria; no exhaustive list exists.").

consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4) market concentration and structure conducive to collusion; (5) pretextual explanations for anticompetitive conduct; (6) sharing of price information; (7) signaling; and (8) involvement in other conspiracies.[66]

"A plausible allegation that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement is generally considered the most important 'plus factor.'"[67]

A court's task in evaluating the propriety of summary judgment is to "[v]iew[] all the evidence and tak[e] the plus factors into consideration" and determine if the evidence tips the scales in favor of a conspiracy by "tend[ing] to exclude the possibility that the alleged coconspirators acted independently or based upon legitimate business purposes."[68] "[T]he quantum of evidence required to exclude the possibility of independent action or legitimate business purposes is

---

[66] *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (citing ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws* 69-91 (1st ed. 2010) [hereinafter *Proof of Conspiracy*] (collecting cases)).

[67] *Id.* (citing *Proof of Conspiracy*, *supra* note 66, at 70); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907-908 (6th Cir. 2009) (explaining that the "[k]ey to" one of the court's prior decisions reversing a grant of summary judgment for the defendants in a Section 1 case was that the anticompetitive policy at issue "would not be in either defendant's *independent* economic interest" and that each defendant would have "a natural inclination *not*" to adopt the policy on its own); *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *10 (4th Cir. 1999) (unpublished) ("Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of a conspiracy.").

[68] *Merck-Medco Managed Care*, 1999 WL 691840, at *9.

directly related to the plausibility of the plaintiff's theory."[69] "If the plaintiff advances a strong, plausible theory then the quantum of evidence tending to exclude independent action is not as great as if the plaintiff advances a weak or implausible theory. Likewise, when there is a risk that the threat of antitrust liability will chill legitimate, procompetitive conduct by market participants, the quantum of evidence is also high."[70]

## IV

We turn to the allegations and evidence in this case.

## A

iPic alleges that AMC and Regal conspired to "crush iPic with clearances" in order to "eliminate" it "from the markets of Houston and Frisco." iPic alleges that the conspiracy was formed in January 2013 when, after hearing AMC's presentation to Open Road, Regal president Greg Dunn directed Regal's film department to clear any luxury or dine-in theater concept within three miles of a Regal theater. iPic further alleges that the conspiracy culminated with AMC and Regal's near simultaneous clearance requests on July 8, 2014. iPic claims no damages

---

[69] *Id.* at *8; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim that would otherwise be necessary.").

[70] *Merck-Medco Managed Care*, 1999 WL 691840, at *8; *see also In re Coordinated Pretrial Procs. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990) ("*Matsushita* establishes that a trial judge should not permit an inference of antitrust conspiracy from circumstantial evidence where to do so would have the effect of deterring significant procompetitive conduct.").

with respect to iPic Frisco—the theater was never built due to failed lease negotiations, and AMC eventually withdrew its clearance requests with respect to that theater. Rather, iPic alleges that Regal's requests to clear iPic Houston resulted in lost revenue and goodwill to that theater and that AMC is vicariously liable for those losses as Regal's co-conspirator.

In our view, the "factual context" of this case "renders [iPic's] claim implausible".[71] The first problem is that the timeline of events makes the existence of an AMC–Regal agreement to target iPic seem farfetched. Regal first told iPic that its Greenway theater would seek clearances against iPic Houston in April 2013, eight months before iPic even began discussing the possibility of a Frisco theater, and a year before AMC learned about iPic's plans for a Frisco theater.

It is also hard to see why AMC and Regal would have any motive to conspire to seek the specific clearances they sought together as a unit rather than independently.[72] There is no nonspeculative basis in the record for concluding that both exhibitors' participation was essential for either to "recover[], in the form of later monopoly profits, more than the losses suffered."[73] To the contrary, Regal did not need AMC's help to

---

[71] *Matsushita*, 475 U.S. at 587.

[72] *Cf. Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d at 444 (noting that "even in highly concentrated markets, a unilateral price hike might be too risky to make without advance agreement if the increase could not be readily reversed without a significant loss of goodwill").

[73] *Matsushita*, 475 U.S. at 589; *accord Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) ("Without . . . a reasonable expectation [of recouping its investment in the long run], a rational

clear iPic in Houston. And when AMC requested clearances against iPic Frisco in July 2014, it was implementing a policy that AMC had unilaterally adopted more than a year-and-a-half earlier, before the conspiracy is alleged to have begun.

iPic argues that by teaming up and making their formal requests on the same day, Regal and AMC would have a greater chance of success with distributors. But it is hard to see why Regal's requests for clearances in Houston would have any impact on a distributor's decision how to allocate films 270 miles away in Frisco, or vice versa.

iPic also contends that Regal and AMC's teaming up sends a stronger message to iPic than either exhibitor's requesting clearances alone would have. But the clearance requests target only two iPics, one of which was never built. Except for iPic Houston, all iPic's theaters have had access to all first-run films since the day they opened their doors. One of these, iPic Los Angeles, opened within a three-mile radius of an AMC theater in April 2013—after the conspiracy allegedly began—and AMC declined to clear it. If AMC and Regal did conspire in January 2013 to "crush iPic with clearances", the conspiracy was a failure.[74]

**B**

iPic nonetheless contends that it has presented evidence of

---

firm would not willingly suffer definite, short-run losses."); *Interstate Cir. v. United States*, 306 U.S. 208, 226 (1939) ("Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.").

[74] *See Matsushita*, 475 U.S. at 592 ("The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist.").

several plus factors that collectively tip the scales in favor of a conspiracy. We start with the "most important" one: whether the clearance requests "would be against [AMC's] self-interest if [it] were acting independently, but consistent with [AMC's] self-interest if [it] were acting in concert" with Regal.[75] iPic relies primarily on three categories of evidence to establish this plus factor:

(1) internal analyses by AMC projecting that a clearance zone in which films are allocated between an AMC theater and a nearby iPic may result in substantially more revenue loss to AMC than its theater's playing day-and-date with a nearby iPic would;

(2) deposition testimony of Regal executive Ted Cooper that the results of Regal's "test" decision not to clear iPic Redmond in 2008 indicated that having an iPic-type luxury theater's playing day-and-date with a nearby Regal theater would actually increase attendance at the Regal theater; and

(3) data indicating that Regal Greenway lost substantial revenue in November 2015 when it refused to play a new Star Wars movie that the studio offered to both iPic and Greenway in defiance of Regal's clearance request.[76]

---

[75] *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013); *see also Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 475 (6th Cir. 2005) (phrasing this plus factor as "whether the defendants' actions, if taken independently, would be contrary to their economic self-interest"); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 570 n.33 (11th Cir. 1998) ("[W]e read this reference to a defendant's 'economic self-interest' as a reference to what that defendant's legitimate economic self-interest would be under the assumption that it acted alone . . . .").

[76] iPic also argues that "[t]he studios . . . acted against their own interests in allocating films between iPic and Regal" because their stated preference would have been to license films to both Greenway and iPic Houston simultaneously. But iPic has not named any studio as a co-conspirator, and

This evidence supports iPic's assertion that it is against an exhibitor's economic interest—in the short term, at least—to refuse to play day-and-date with a competitor. The court of appeals recognized as much but then leapt to the conclusion that the first and "most important" plus factor had been established.[77] iPic mostly parrots this analysis, and it is incorrect.

There is nothing illegal about a company's pursuing action that trades short-term financial loss for long-term gain. Commentators have warned that "[o]ne must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to self-interest. Such a sacrifice by itself tells us nothing about possible conspiracy[] because a firm often makes this choice . . . ."[78] Rather, the inquiry the first plus factor invites is whether the conduct at issue would be against the defendant's self-interest *if it were acting independently*, but consistent with the defendant's self-interest if it were acting in concert with another.

---

one could just as easily argue that keeping Regal happy would be in a studio's long-term interest.

[77] *See* 592 S.W.3d 946, 957 (Tex. App.—Houston [1st Dist.] 2019) ("Summary-judgment evidence showed that clearances were not necessarily profitable in the short run but could help exhibitors avoid overall losses in the long run. Thus, AMC was acting against its short-term economic interest by seeking a clearance of the proposed iPic Frisco . . . .").

[78] 6 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 110 (3d ed. 2010); *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003) ("[W]e must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds.").

iPic argues that "a reasonable jury could find that AMC and Regal would only expose themselves to such an economic hit, in tandem with one another, if they expected to jointly drive their new premium boutique competitor out of business in Frisco, Houston, and around the country." But that is simply not a rational inference in the factual context of this case, where it is undisputed that both Regal and AMC have sought other clearances independently. iPic claims that a conspiracy between Regal and AMC to harm iPic's business in Houston and Frisco "would radically expand the area in which iPic [would be] precluded from competing", but the record does not support that assertion. Regal may have been trying to harm iPic's Houston theater, and AMC was undoubtedly trying to preclude an iPic Frisco from even being built. But nothing about the economics of the July 2014 clearance requests suggests that they were made pursuant to an otherwise "economically senseless" agreement.[79] Thus, iPic's "concept of 'action against self-interest' . . . merely constitute[s] a restatement of interdependence."[80]

iPic argues that it has also presented evidence of several plus factors found by the court of appeals: motive and opportunity to conspire, communications between the parties, a pretextual explanation

---

[79] *Matsushita*, 475 U.S. at 596-597.

[80] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power . . . by recognizing their shared economic interests and their interdependence with respect to price and output decisions.").

for anticompetitive conduct, and facts consistent with a traditional conspiracy.[81] The evidence iPic points to in support of these factors fits roughly into three buckets.

The first bucket consists of evidence of communications between AMC and Regal between 2012 and 2014, sometimes through their joint venture, Open Road. In May 2012, Rich Boynton at AMC emailed his contacts at Open Road and asked them to find out whether Regal would be clearing a dine-in theater called Studio Movie Grill that was rumored to be opening near Regal Greenway. Open Road's Elliot Slutzky responded that Regal had informed him that it would not be clearing that theater. iPic alleges that this exchange violated Open Road's information-sharing guidelines, which forbade AMC and Regal from sharing "competitively sensitive information" about their film-exhibition businesses in order to avoid antitrust allegations.[82]

The record also contains an internal AMC report dated November 2012 that lists theaters planned by competitors along with a recommendation whether to seek a clearance against each theater. One page of the report analyzes a new Regal theater being built in the Atlanta area and expected to open in 2014. The clearance-recommendation section states: "Further conversation needed with Regal". An email circulated internally at AMC in June 2014 reflects that AMC had decided not to clear that Atlanta Regal and states: "[W]e are

---

[81] 592 S.W.3d at 958.

[82] AMC disputes that clearance decisions are "competitively sensitive information" and contends that it could have obtained the same information from distributors, Studio Movie Grill, or industry reports.

going to tell Regal since we decided not to clear you here you should un-clear us at Shirlington."

The second bucket holds the timeline of AMC's and Regal's decisions to start clearing dine-in theaters and their communications with studios about clearing iPic. Included are the facts that AMC and Regal sent their requests to clear iPic on the same day and that each exhibitor's request stated that its theater would refuse to play first-run films offered to iPic—statements that iPic characterizes as "threats".

The third bucket holds a shred of evidence involving Regal's post-clearance-request conduct. In a November 2015 email, Alan Davy, the Regal executive who made the July 2014 clearance requests, reported to the general manager of Regal's MarqE megaplex that iPic "tanked" on *The Peanuts Movie* and then said: "The problem was Studio 30 didn't get the benefit." Studio 30 was an AMC megaplex (now closed) that was located about five miles from both Regal Greenway and iPic Houston.

Taking iPic's evidence together and in the light most favorable to iPic, we conclude that it does not raise a genuine issue of material fact that the conspiracy iPic alleges ever existed. The national clearance strategy that AMC adopted in late 2012 became public knowledge when it was presented directly to distributors around the same time that it was presented to Open Road. It may be that AMC and Regal were monitoring each other's clearance strategies, but there is no evidence that Regal and AMC ever communicated with one another about clearing iPic.

Allegations of general contacts or even specific contacts that are abstract or vague in nature are not enough to support a reasonable

inference of conspiracy under federal law.[83] That is all iPic has here. The Open Road email chain shows only that AMC obtained information (perhaps wrongfully) about Regal's intentions with respect to *another* dine-in theater in Houston. This exchange occurred a year before iPic even started making plans for a Frisco theater. Other evidence shows that AMC and Regal may have engaged in some horse trading with respect to clearances between their own theaters. That may be normal industry behavior or it may be improper. Regardless, it is not evidence of a conspiracy directed towards iPic. Alan Davy's November 2015 email comment that AMC's Studio 30 "didn't get the benefit" of iPic's poor

---

[83] *See Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488 (D.C. Cir. 1984) ("The mere showing of frequent relations between alleged co-conspirators, however, is insufficient to infer an illegal agreement."); *id.* at 1489 ("These specific contacts between [the defendants] are of too *abstract* a nature for this court to infer a conspiracy to violate the Sherman Act."); *see also Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) (concluding that plaintiffs' "'proof' of prior knowledge amount[ed] to nothing more than speculation" where the "supposed smoking gun" consisted of a single memo that "could be nothing more than a somewhat accurate industry prediction"); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) (concluding that three "sporadic communications" between competitors' employees were "insufficient to create a reasonable inference of a conspiracy"); *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1034-1035 (8th Cir. 2000) (en banc) ("The price verifications relied upon were sporadic and testimony suggests that price verifications were not always given. The fact that there were several dozen communications is not so significant considering the communications occurred over at least a seven-year period in which there would have been tens of thousands of transactions."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1105 (9th Cir. 1999) (concluding that evidence of "sporadic price discussions" between individuals at competing companies was insufficient to survive summary judgment); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357-1358 (9th Cir. 1982) (noting the trial court's finding "that franchisees had established only sporadic exchanges of price information" and concluding that the exchanges "failed to prove any unlawful conspiracy").

performance on *The Peanuts Movie* is certainly odd, but there is no link in the evidence between this email and AMC's request to clear iPic Frisco.

*   *   *   *   *

The conspiracy that iPic has alleged is implausible, and its case rests on parallel conduct and suspicion. That is not enough to survive summary judgment under federal antitrust law because it does not tend to exclude the possibility that AMC acted independently.[84] Because we construe the Texas Antitrust Act in harmony with federal law, iPic's evidence is not enough to survive summary judgment under the Texas Act either.[85] We reverse the court of appeals' judgment and render judgment for AMC.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** January 14, 2022

---

[84] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007); *Matsushita*, 475 U.S. at 593-598.

[85] *See* TEX. BUS. & COM. CODE § 15.04 ("The provisions of this Act shall be construed . . . in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . .").